RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 15a0258p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

BIBLE BELIEVERS; RUBEN CHAVEZ, AKA RUBEN
ISRAEL; ARTHUR FISHER; JOSHUA DELOSSANTOS,

*Plaintiffs-Appellants,*

*v.*

No. 13-1635

WAYNE COUNTY, MICHIGAN; BENNY N. NAPOLEON,
in his official capacity as Sheriff, Wayne County
Sheriff's Office; DENNIS RICHARDSON, individually
and in his official capacity as Deputy Chief, Wayne
County Sheriff's Office; MIKE JAAFAR, individually
and in his official capacity as Deputy Chief, Wayne
County Sheriff's Office,

*Defendants-Appellees.*

———————————

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit
No. 2:12-cv-14236—Patrick J. Duggan, District Judge.

Argued: March 4, 2015

Decided and Filed: October 28, 2015

Before:   COLE, Chief Judge; BOGGS, BATCHELDER, MOORE, CLAY, GIBBONS,
ROGERS, SUTTON, COOK, McKEAGUE, GRIFFIN, KETHLEDGE, WHITE,
STRANCH, and DONALD, Circuit Judges.

———————————

## COUNSEL

**ARGUED:**  Robert Joseph Muise, AMERICAN FREEDOM LAW CENTER, Ann Arbor,
Michigan, for Appellants.  Nabih H. Ayad, AYAD LAW, P.L.L.C., Canton, Michigan, for
Appellees. **ON BRIEF:**  Robert Joseph Muise, AMERICAN FREEDOM LAW CENTER, Ann
Arbor, Michigan, David Yerushalmi, AMERICAN FREEDOM LAW CENTER, Washington,
D.C., for Appellants.  Nabih H. Ayad, AYAD LAW, P.L.L.C., Canton, Michigan, for Appellees.
Nathan W. Kellum, CENTER FOR RELIGIOUS EXPRESSION, Memphis, Tennessee, Daniel
S. Korobkin, AMERICAN CIVIL LIBERTIES UNION, Detroit, Michigan, Julie M. Carpenter,
JENNER & BLOCK LLP, Washington, D.C., for Amici Curiae.

1

CLAY, J., delivered the opinion of the court in which COLE, C.J., BOGGS, BATCHELDER, MOORE, KETHLEDGE, WHITE, and STRANCH, JJ., joined, and SUTTON and GRIFFIN, JJ., joined in part. BOGGS, J. (pp. 42–45), delivered a separate concurring opinion in which BATCHELDER, CLAY, and WHITE, JJ., joined. GRIFFIN, J. (pp. 46–48), delivered a separate opinion concurring in part, and dissenting from Part IV and the final two paragraphs of Part I.C.4 of the majority opinion. SUTTON, J. (pg. 49), delivered a separate opinion concurring in part in Part I of the majority opinion, and in Parts II and III of the dissent of GIBBONS, J. GIBBONS, J. (pp. 50–59), delivered a separate dissent in which COOK and McKEAGUE, JJ., joined, and SUTTON, J., joined in part. ROGERS, J. (pp. 60–65), delivered a separate dissent in which GIBBONS, COOK, McKEAGUE, and DONALD, JJ., joined.

---------------

**OPINION**

---------------

CLAY, Circuit Judge. Plaintiffs Ruben Chavez ("Israel"), Arthur Fisher, Joshua DeLosSantos, and the Bible Believers (collectively "the Bible Believers" or "Plaintiffs") appeal the district court order entering summary judgment in favor of Defendants Sheriff Benny N. Napoleon, Deputy Chief Dennis Richardson, Deputy Chief Mike Jaafar, and Wayne County (collectively "Wayne County" or "Defendants"). Plaintiffs initiated this constitutional tort action pursuant to 42 U.S.C. § 1983, alleging that Defendants violated their First Amendment rights to freedom of speech and free exercise of religion, as well as their Fourteenth Amendment right to equal protection of the laws. The district court held that Defendants' actions in cutting off the Bible Believers' religious speech did not violate the Constitution. We **REVERSE** the judgment of the district court in full and **REMAND** this case for entry of summary judgment in favor of Plaintiffs, for the calculation of damages, and for the award of appropriate injunctive relief, consistent with this opinion.

**BACKGROUND**

"If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Snyder v. Phelps*, 562 U.S. 443, 458 (2011) (citation and internal quotation marks omitted). "Nowhere is this [First Amendment] shield more necessary than in our own country for a people composed [from such diverse backgrounds]." *Cantwell v. Connecticut*, 310 U.S. 296, 310 (1940). Born from immigrants, our national identity is woven together from a

mix of cultures and shaped by countless permutations of geography, race, national origin, religion, wealth, experience, and education. Rather than conform to a single notion of what it means to be an American, we are fiercely individualistic as a people, despite the common threads that bind us. This diversity contributes to our capacity to hold a broad array of opinions on an incalculable number of topics. It is our freedom as Americans, particularly the freedom of speech, which generally allows us to express our views without fear of government sanction.

Diversity, in viewpoints and among cultures, is not always easy. An inability or a general unwillingness to understand new or differing points of view may breed fear, distrust, and even loathing. But it "is the function of speech to free men from the bondage of irrational fears." *Whitney v. California*, 274 U.S. 357, 376 (1927) (Brandeis, J., concurring). Robust discourse, including the exchanging of ideas, may lead to a better understanding (or even an appreciation) of the people whose views we once feared simply because they appeared foreign to our own exposure. But even when communication fails to bridge the gap in understanding, or when understanding fails to heal the divide between us, the First Amendment demands that we tolerate the viewpoints of others with whom we may disagree. If the Constitution were to allow for the suppression of minority or disfavored views, the democratic process would become imperiled through the corrosion of our individual freedom. Because "[t]he right to speak freely and to promote diversity of ideas . . . is . . . one of the chief distinctions that sets us apart from totalitarian regimes," *Terminiello v. City of Chi.*, 337 U.S. 1, 4 (1949), dissent is an essential ingredient of our political process.

The First Amendment "may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." *Id*. If we are not persuaded by the contents of another's speech, "the remedy to be applied is more speech, not enforced silence." *Whitney*, 274 U.S. at 377 (Brandeis, J., concurring). And although not all manner of speech is protected, generally, we interpret the First Amendment broadly so as to favor allowing more speech. *See Cox v. Louisiana*, 379 U.S. 536, 578 (1965) ("[W]hen passing on the validity of a regulation of conduct, which may indirectly infringe on free speech, this Court . . . weigh[s] the circumstances in order to protect, not to destroy, freedom of speech." (internal quotation marks omitted)) (Black, J., concurring).

This case calls on us to confirm the boundaries of free speech protections in relation to angry, hostile, or violent crowds that seek to silence a speaker with whom the crowd disagrees. Set against the constitutional right to freedom of speech, we must balance the state's interest in insuring public safety and preventing breaches of the peace. The scenario presented by this case, known as the "heckler's veto," occurs when police silence a speaker to appease the crowd and stave off a potentially violent altercation.[1]  The particular facts of this case involve a group of self-described Christian evangelists preaching hate and denigration to a crowd of Muslims, some of whom responded with threats of violence. The police thereafter removed the evangelists to restore the peace. Bearing in mind the interspersed surges of ethnic, racial, and religious conflict that from time to time mar our national history, the constitutional lessons to be learned from the circumstances of this case are both timeless and markedly seasonable.

In this opinion we reaffirm the comprehensive boundaries of the First Amendment's free speech protection, which envelopes all manner of speech, even when that speech is loathsome in its intolerance, designed to cause offense, and, as a result of such offense, arouses violent retaliation. We also delineate the obligations and duties of law enforcement personnel or public officials who, in the exercise of the state's police power, seek to extinguish any breaches of the peace that may arise when constitutionally protected speech has stirred people to anger, and even to violence.

**Facts**

**A.      Dearborn and the Arab International Festival**

Dearborn—home of the world headquarters of the Ford Motor Company—is a city located in Wayne County, Michigan, that borders Detroit and has a stable population of approximately 100,000 people.[2]  Dearborn is also home to one of the largest populations of Arab

---

[1]The term "heckler's veto" is ascribed to Harry Kalven, a constitutional scholar, who noted when writing about free speech and angry crowds, "If the police can silence the speaker, the law in effect acknowledges a veto power in hecklers who can, by being hostile enough, get the law to silence any speaker of whom they do not approve." Harry Kalven, Jr., The Negro and the First Amendment 140 (Ohio St. Univ. Press 1965).

[2]*State & County QuickFacts: Dearborn (city), Michigan*, United States Census Bureau, http://quickfacts.census.gov/qfd/states/26/2621000.html (last revised Oct. 14, 2015).

Americans in the country—second only to New York City.[3]   Dearborn's Arab American population is comprised of both Christian and Muslim families whose national origins include Lebanon, Armenia, Yemen, Iraq, and Palestine, among other nations.[4]

Beginning in 1996 and continuing for 17 years thereafter, each June, Dearborn celebrated its Arab heritage and culture by hosting the Arab International Festival.  The Festival, which was free to the public, featured Middle Eastern food, music, artisan booths, cultural acts, and other amusements, including carnival rides.  A principal purpose of the Festival was to promote cultural exchange.  Each year, the Festival took place on a stretch of Warren Avenue, covering several blocks temporarily closed to vehicular traffic.  The street became a pedestrian thoroughfare lined with vendors and information booths.  The brick and mortar stores lining the Warren sidewalks also remained open.  The Festival attracted people from around the world, and by 2012, it was the largest festival of its kind in the United States, annually drawing more than 300,000 people over the course of three days.

Given the size of attendance and the Festival's focus on cultural exchange, a diverse array of religious groups requested permission to set up information booths on the Festival grounds.[5]   The Festival also had a history of attracting certain Christian evangelists who preferred to roam free among the crowd and proselytize to the large number of Muslims who were typically in attendance each year.[6]  These evangelists would come from across the country to distribute leaflets up and down the sidewalks of Warren Avenue in the heart of the Festival. This practice was disrupted in 2009 when the Dearborn police enforced an anti-leafletting policy promoted by the American Arab Chamber of Commerce—the Festival's primary sponsor—and

---

[3]G. Patricia de la Cruz & Angela Brittingham, U.S. Census Bureau, C2KBR-23, The Arab Population: 2000, at 7 tbl.3 (Dec. 2003), *available at* https://www.census.gov/prod/2003pubs/c2kbr-23.pdf.

[4]Who Are Arab Americans?, Arab American Institute, http://www.aaiusa.org/who-are-arab-americans (last visited June 10, 2015); Pierre M. Atlas, Living Together Peacefully in Heart of Arab America, Common Ground News Service (Sept. 13, 2005), http://www.commongroundnews.org/article.php?id=1044&lan=en&sid=1&sp=0.

[5]In 2012, among these religious groups were an Islamic educational organization, a couple of Arab churches, as well as a few non-Arab Christian ministries.  These groups were stationed under one tent, along with other non-religious organizations seeking to share information.

[6]The Muslim population in Dearborn is notable, distinctly, for its relative size and longtime presence; both the largest mosque and one of the oldest mosques in the United States are located in Dearborn. Michele Norris, Largest U.S. Mosque Opens in Michigan, NPR (May 12, 2005), http://www.npr.org/templates/story/story.php?storyId=4650047; AMS History, The American Moslem Society, http://www.masjiddearborn.org/en/about-the-ams/history (last visited Oct. 20, 2015).

ratified by the City.  A panel of this Court subsequently held that Dearborn's anti-leafletting policy unconstitutionally encroached on the free speech rights protected by the First Amendment because it failed to serve a substantial government interest and it was not narrowly tailored, as is required with respect to any time, place, or manner restriction on protected speech.  *See Saieg v. City of Dearborn*, 641 F.3d 727 (6th Cir. 2011).  The City of Dearborn thereafter ceded to the Wayne County Sheriff's Office ("WCSO") primary responsibility over Festival security in future years.

**B.      The Bible Believers**

The Bible Believers were among the self-described evangelical groups that attended the Festival for the purpose of spreading their Christian beliefs.  The founder and leader of the Bible Believers, known as "Israel," testified that due to his sincerely held religious beliefs he was required "to try and convert non-believers, and call sinners to repent."  Therefore, Israel and his Bible Believers regularly engaged in street preaching, which consisted of advocating for their Christian beliefs and parading around with banners, signs, and tee-shirts that displayed messages associated with those beliefs.  Many of the signs and messages displayed by the Bible Believers communicated overtly anti-Muslim sentiments.

In 2011, Israel attended the Festival with a number of Bible Believers to preach to the crowd of Festival-goers.  Upon their arrival at the Festival on Friday, June 17, 2011, the Bible Believers were directed to a protected area on the Festival grounds referred to as a "free speech zone."  When they returned to the Festival on Sunday, June 19, the Bible Believers were informed that the free speech zone had been removed and would not be made available again. The Bible Believers therefore opted to walk the public streets and sidewalks, spreading their message to those who passed by.  The quintessential attribute of the Bible Believers' message was intolerance, principally proclaiming that Mohammed was a false prophet who lied to them and that Muslims would be damned to hell if they failed to repent by rejecting Islam.[7]  This message was not well received by certain elements of the crowd.  The Bible Believers allege that they were assaulted by various members of the crowd and that the WCSO initially watched and

---

[7]We presume that the character of the Bible Believers' activities in 2011 was similar if not essentially the same as their activities in 2012, although the record is devoid of a specific factual account of the 2011 Festival.

did nothing, then eventually silenced the Bible Believers by kicking them out and requiring them to leave the Festival grounds.  They also alleged that Deputy Chief Jaafar personally arrested one of the Bible Believers to the delight of the "violent Muslims."  No formal action was taken by either party as a result of this alleged incident.

### C.          May 2012 Pre-Festival Letters and Preparation

Israel and his Bible Believers determined to return to Dearborn the following year for the 2012 Arab International Festival.  Prior to the Festival, the Bible Believers, through their counsel, sent a letter to Defendants Wayne County and Sheriff Napoleon recounting the Bible Believers' experience at the 2011 Festival.  The letter also apprised Defendants of the Bible Believers' expectations for the group's return visit:

> In light of the past actions by the officers, I write to remind the Wayne County Sheriff's Department [sic] of two points.  First, the officers have a duty to protect speakers like Israel from the reactions of hostile audiences.  *See Glasson v. City of Louisville*, 518 F.2d 899, 906 (6th Cir. 1975) ("A police officer has the duty not to ratify and effectuate a heckler's veto nor may he join a moiling mob intent on suppressing ideas.  Instead, he must take reasonable action to protect from violence persons exercising their constitutional rights.").  If the officers allow a hostile audience to silence a speaker, the officers themselves effectively silence the speaker and effectuate a "heckler's veto."  The First Amendment simply does not countenance this scenario.  *See, e.g., Forsyth County*, 505 U.S. at 134; *Boos v. Barry*, 485 U.S. 312, 320-21 (1998).  *See also Smith v. Ross*, 482 F.2d 33, 37 (6th Cir. 1973) ("[S]tate officials are not entitled to rely on community hostility as an excuse not to protect, by inaction or affirmative conduct, the exercise of fundamental rights.").  Second, Israel has the First Amendment right to engage in peaceful expression on streets and sidewalks during the Arab International Festival.  *See, e.g., Saieg v. City of Dearborn*, 641 F.3d 727, 737-41 (6th Cir. 2011) (invaliding [sic] ban on literature distribution on public sidewalks open to public during the Arab International Festival).

(R. 13-7, May 9, 2012 Ctr. for Relig. Expression Ltr., PGID 110).

Wayne County, through its Corporation Counsel, responded by letter on June 14, 2012.  The letter indicated Wayne County's disagreement with respect to both the characterization of events at the 2011 Festival and with the Bible Believers' interpretation of the law regarding the WCSO's duties to the public and to the Bible Believers.  Corporation Counsel noted the WCSO's intent to "maintain public order consistent with its legal obligations," but specifically disclaimed any "'special relationship' between the WCSO and Mr. Israel" to avoid the

possibility that Israel would assert in subsequent litigation that the WCSO owed Bible Believers a heightened measure of protection.  (R. 13-8, Corp. Counsel Reply, PGID 112).

The letter went on to "remind [the Bible Believers] that, under state law and local ordinances, individuals can be held criminally accountable for conduct which has the tendency to incite riotous behavior or otherwise disturb the peace." (*Id.* at 113).  In conclusion, Corporation Counsel likewise cited to Sixth Circuit precedent to support the County's view that its obligations to protect the Bible Believers' speechmaking had limitations:

> [L]aw enforcement personnel are not required "to defend the right of a speaker to address a hostile audience, however large and intemperate, when to do so would unreasonably subject them to violent retaliation and physical injury." *Glasson v. City of Louisville*, 518 F.2d 899 at 909 (6th Cir. 1975). Rather, "[i]n such circumstances, they may discharge their duty of preserving the peace by intercepting his message or by removing the speaker for his own protection . . . [.]"

(*Id.* at 113).

Earlier that month, Deputy Chief Jaafar circulated an Operations Plan memorandum, addressed to Sheriff Napoleon, which outlined the policies and procedures to be followed by the WCSO throughout the course of the 2012 Arab International Festival.  The second item in the memorandum addressed potential "situation[s]" that could lead to trouble at the Festival.  Among the purported situations was "a radical group calling themselves 'The Bible Believers'" that had been attracted to the Festival in recent years, and that would "possibly show up at the festival trying to provoke [the WCSO] in a negative manner and attempt to capture the negativity on video camera." (13-5, Ops. Plan, PGID 100).  Deputy Chief Jaafar instructed his officers "to be alert and professional at all times . . . [and to] [r]epeat as many times as necessary" the appropriate orders to any group causing trouble. (*Id.*)  As an example, he suggested repeating the following command:  "Sir, you are causing a disturbance, please keep moving." (*Id.*)  He also noted that the WCSO would "not abridge or deny anyone's Freedom of Speech, unless public safety becomes [a] paramount concern." (*Id.*)

The WCSO decided to employ both regular and reserve officers "to ensure public safety, keep the peace, and maintain order in the event there is a disturbance." (*Id.* at 101).  According to Deputy Chief Richardson, a greater number of WCSO personnel were "allocated to the

Festival . . . than . . . to the World Series or to the President of the United States when he visits Michigan." (R. 13-6, Richardson Aff., PGID 107). The number of personnel also exceeded the number "allocated to other large festivals in Michigan." (*Id.*) The Operations Plan listed 51 officers (excluding those in command), most of whom were assigned to one of six zones. Among this group, there were also 19 officers (including 6 mounted units) who were not assigned to any one specific zone, allowing them to respond to changing needs and circumstances.

### D.       The 2012 Arab International Festival[8]

The Bible Believers returned to Dearborn in 2012, at approximately 5:00 p.m. on Friday, June 15, for the 17th Annual Arab International Festival. As they had done the previous year, the Bible Believers traveled to the Festival so that they could exercise their sincerely held religious beliefs. Unfortunately for the Festival-goers, those beliefs compelled Israel and his followers to hurl words and display messages offensive to a predominantly Muslim crowd, many of whom were adolescents. These messages were written on their tee-shirts and on the banners and signs that they carried. The following is a sampling of the Bible Believers' messages:

"Islam Is A Religion of Blood and Murder"
"Jesus Is the Way, the Truth and the Life. All Others Are Thieves and Robbers"
"Prepare to Meet Thy God – Amos 4:12"
"Jesus Is the Judge, Therefore Repent, Be Converted That Your Sins May Be Blotted Out"
"Trust Jesus, Repent and Believe in Jesus"
"Only Jesus Christ Can Save You From Sin and Hell"
"Turn or Burn"
"Fear God"

(R. 20-2, Israel Decl., PGID 176–77). In addition to the signs, one of the Bible Believers carried a severed pig's head on a spike, because, in Israel's own words, it would "ke[ep] [the Muslims] at bay" since "unfortunately, they are kind of petrified of that animal." (R. 28-A, Raw Festival Footage, Time: 00:49:45).

---

[8]Most of the facts regarding the 2012 Arab International Festival are derived from a video recording that the Bible Believers made during the Festival in order to contemporaneously memorialize their free speech activities.

Laden with this imagery, the Bible Believers entered the Festival and began their preaching. At first, few people paid attention other than to glance at what appeared to be an odd assembly. The first speaker told the crowd that they should not follow "a false prophet," who was nothing but an "unclean drawing" and "a pedophile." (*Id.* at 00:01:40). He continued by telling what was by then a group made up of approximately thirty teenagers that "[y]our religion will send you to hell." (*Id.* at 00:03:30). Tensions started to rise as a few youths became incensed after the speaker taunted, "You believe in a prophet who is a pervert. Your prophet who wants to molest a child," and "God will reject you. God will put your religion into hellfire when you die." (*Id.* at 00:03:56, 00:04:38). This continued as a few of the teens became agitated, until one youth simply told his friends to "quit giving them attention," convincing some members of the crowd to disperse. (*Id.* at 00:06:07).

After approximately seven minutes of proselytizing, some elements of the crowd began to express their anger by throwing plastic bottles and other debris at the Bible Believers. An officer was captured on video observing the scene without intervening or reprimanding the juvenile offenders. The size of the crowd ebbed and flowed. At one point an officer approached the Bible Believers and commanded that the speakers stop using a megaphone or be cited for violating city ordinances. The Bible Believers relented, but also responded by noting that "these angry kids are a little bit more vicious than the megaphone." (*Id.* at 00:16:16). A few minutes later, an officer did ask the kids to back up and subsequently removed one of the teenagers who he saw throwing a bottle. However, all police presence and intervention dissipated after this minimal and isolated intervention.

The Bible Believers continued preaching for another ten minutes without the megaphone, all while a growing group of teenagers jeered and heckled, some throwing bottles and others shouting profanities. At one point, a parent stepped in to reprimand his child for participating in the assault. The onslaught reached its climax when a few kids began throwing larger items such as milk crates. By that time, the Bible Believers had stopped all speechmaking whatsoever.

A number of debates spawned between members of the crowd (which had continued to swell) and individual Bible Believers. A particularly emotional youth debated with a Bible Believer the merits of his group's bigoted views, noting that he had studied both the Quran and

the Bible, and that Muslims believe in the same First Testament as the followers of Christianity. This brief moment of reasoned debated devolved into a shouting match, and ended when the youth was pulled away by an unidentified individual.

A few minutes later, the crowd of youths became quiet after four mounted officers simply rode by, without making commands or pausing—even for a moment. The calm persisted while Israel gave an interview to a local news crew. But once this interview ended, and the police and camera crews left the scene, the Bible Believers again were assaulted with flying debris. The Bible Believers turned away from the crowd and started moving through the Festival for a second time. A large contingent of children ran after them, and the relatively light cascade of debris intensified into a barrage of bottles, eggs, and other debris being hurled upon the Bible Believers. When the Bible Believers again resettled at a new location, and with their backs no longer facing the crowd, the torrent died down. At some point during the deluge, Israel was struck in the face, which resulted in him suffering a small laceration.

When an officer arrived on the scene a few minutes later, the children's belligerence and the assaultive behavior again ceased. The officer bellowed at a few youths to move out of the way; they complied immediately. He then told Israel, "you are a danger to public safety right now," and stated that the WCSO did not have the manpower to keep the Bible Believers safe. (*Id.* at 00:43:12). The officer then suggested that the Bible Believers always "have the option to leave," while he simultaneously ignored Israel's plea that some sort of police presence just remain in the general vicinity. The officer departed, and the bottle throwing resumed.

A few minutes later, a group of officers returned to the area and cut a path through the crowd in order to approach Israel and his followers. Deputy Chiefs Richardson and Jaafar pulled Israel aside for the purpose of telling him that the Bible Believers would be escorted out of the Festival. But Israel responded that he was unprepared to leave without having the opportunity to finish walking his parade route while exercising his First Amendment rights.

Richardson explained to Israel, "We have the responsibility of policing the entire festival, and obviously your conduct especially is causing this disturbance and it is a direct threat to the safety of everyone here." (*Id.* at 00:48:30). He also noted that "part of the reason they throw this stuff . . . is that you tell them stuff that enrages them." (*Id.* at 00:49:03). Israel protested, first by

noting that the disturbances only occurred in the absence of any police presence, and second, by commenting that the Bible Believers had stopped preaching altogether during the previous twenty minutes and were only carrying signs. Israel suggested that if the WCSO just assigned two officers to insure that the crowd of adolescents surrounding the Bible Believers' demonstration remained nonviolent, all concerns about public safety would be resolved. Deputy Chief Jaafar chimed in at this point by telling Israel that the WCSO could not provide individual officers for every group that wanted to protest at the Festival, and that Israel's group needed to leave because his group's conduct was "attracting a crowd and . . . affecting public safety." (*Id.* at 00:50:40). When Israel continued to protest that he was not speaking and his signs were permissible, Richardson, again, pointed to the Bible Believers' speech as the cause for the unrest. He stated, "ya know, apparently what you are saying to them and what they are saying back to you is creating danger." (*Id.* at 00:50:48). Richardson continued suggesting that Israel leave, but Israel refused to do so unless the WCSO was prepared to threaten Israel with the prospect of being arrested. Richardson expressed fear that the situation was escalating and stated, "the problem is that one of your people's gonna get hurt, or one of the crowd is gonna get hurt, or one of my officers is gonna get hurt." (*Id.* at 00:52:41). When Israel again inquired whether the Bible Believers would be arrested if they did not leave the Festival, Richardson only committed to saying that they would "probably" be cited if they did not allow themselves to be escorted out. He thereafter told Israel that the Bible Believers were being "disorderly," to which Israel replied, incredulously, "I would assume 200 angry Muslim children throwing bottles is more of a threat than a few guys with signs." (*Id.* at 00:53:48).

Following this exchange, Deputy Chiefs Richardson and Jaafar conferred with Corporation Counsel. Another half dozen officers stood along the edge of the barricaded area to which the Bible Believers had been secluded. On the other side of the barricade, the Festival continued. Richardson returned to speak with Israel and confirmed that Israel and his Bible Believers would be cited for disorderly conduct if they did not immediately leave the Festival. (*Id.* at 00:55:03) ("If you don't leave we're gonna cite you for disorderly."). Israel complied, and the Bible Believers were escorted out of the Festival by more than a dozen officers. Four mounted officers also surveyed the scene on the edge of the Festival where the Bible Believers were being directed to exit.

The Bible Believers loaded into a van and departed. However, two WCSO cruisers immediately began following the van and pulled the Bible Believers over within only a few blocks of the Festival—a third cruiser pulled up shortly thereafter. Officers claimed that the Bible Believers were stopped because they had removed the license plate from their vehicle prior to their departure. After waiting for nearly thirty minutes, they were issued a citation. By that time, two additional officers had arrived on bicycles, bringing the total number of law enforcement personnel involved in this traffic stop to eight officers.

The WCSO made a post-operation report summarizing its version of the day's events. The report noted that the WCSO was "able to ke[ep] reasonable control of civil peace[, but] [a]s the crowd progress[ed] around the protestors to an unsafe level, we suggested to the protestors to leave the area immediately because public safety was being jeopardized." (R. 13-9, Post-Op. Rpt., PGID 114). The report further noted that "[a]ny subjects that were seen throwing objects [were] immediately taken into custody." (*Id.*). They apparently did not see very much. Only one citation was issued to a 21-year old man who was caught throwing a bottle. The WCSO officers also issued three verbal warnings and briefly detained three juveniles, ranging in age from twelve to seventeen, before ultimately releasing them to the custody of their respective parents.

In summary, the Bible Believers attended the 2012 Festival for the purpose of exercising their First Amendment rights by spreading their anti-Islam religious message. When a crowd of youthful hecklers gathered around the Bible Believers, the police did nothing. When the hecklers began throwing bottles and other garbage at the Bible Believers, a WCSO officer intervened only to demand that the Bible Believers stop utilizing their megaphone to amplify their speech. Virtually absent from the video in the record is any indication that the police attempted to quell the violence being directed toward the Bible Believers by the lawless crowd of adolescents. Despite this apparent lack of effort to maintain any semblance of order at the Festival, each time the police appeared on the video—to reprimand the use of the Bible Believers' megaphone, to suggest that the Bible Believers had the "option to leave" the Festival, to trot by on horseback while doing next to nothing, and to expel the Bible Believers from the Festival under threat of arrest—the agitated crowd became subdued and orderly simply due the authoritative presence cast by the police officers who were then in close proximity. Only once is

an officer seen removing one of the bottle-throwing teens. Israel, when faced with the prospect of being arrested for disorderly conduct, observed, "and you would think we would be complaining, but we're not." (R. 28-A, Raw Festival Footage, Time: 00:55:16). The Bible Believers were thereafter escorted from the Festival and ticketed by a large group of WCSO officers for removing the license plate from their van.

## Procedural History

On September 25, 2012, the Bible Believers initiated this suit, pursuant to 42 U.S.C. § 1983, in the United States District Court for the Eastern District of Michigan. The complaint alleged that Defendants violated the Bible Believers' rights of free speech and free exercise, protected by the First Amendment, as well as their right to equal protection of the laws, guaranteed by the Fourteenth Amendment. Defendants answered, and then subsequently moved, simultaneously, for summary judgment and dismissal of all of the Bible Believers' claims. The Bible Believers filed a response to Defendants' motion, which included a cross-motion for summary judgment, and Defendants filed a reply. The district court issued an opinion granting Defendants' motion for summary judgment, denying the Bible Believers' cross-motion for summary judgment, and dismissing the Bible Believers' claims.

The Bible Believers thereafter filed a timely notice of appeal. The issues were briefed and the case was argued before a three-judge panel of this Court the following year. The panel, in a split decision, affirmed the judgment of the district court granting summary judgment to Wayne County and the individual Defendants. *Bible Believers v. Wayne Cty.*, 765 F.3d 578 (6th Cir. 2014). The Bible Believers petitioned for *en banc* rehearing. We granted that petition, thereby vacating the panel opinion, *id*. (opinion vacated, reh'g en banc granted Oct. 23, 2014), and heard oral argument for a second time on March 4, 2015.

## DISCUSSION

### Standard of Review

We review *de novo* an appeal from a grant of summary judgment. *Gillie v. Law Office of Eric A. Jones, LLC*, 785 F.3d 1091, 1097 (6th Cir. 2015). Summary judgment is appropriate when there exists no genuine dispute with respect to the material facts and, in light of the facts

presented, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. "The court may look to the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits when ruling on the motion." *Gillie*, 785 F.3d at 1097 (citation and internal quotation marks omitted). The facts must be viewed in the light most favorable to the non-moving party and the benefit of all reasonable inferences in favor of the non-movant must be afforded to those facts. *Id.* The mere "scintilla of evidence" within the record that militates against the overwhelming weight of contradictory corroboration does not create a genuine issue of fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

**Analysis**

**I.       The First Amendment and the "Heckler's Veto"**

Free-speech claims require a three-step inquiry: first, we determine whether the speech at issue is afforded constitutional protection; second, we examine the nature of the forum where the speech was made; and third, we assess whether the government's action in shutting off the speech was legitimate, in light of the applicable standard of review. *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985); *Saieg*, 641 F.3d at 734–35.

We need only to address steps one and three because the parties agree that the Festival constituted a traditional public forum available to all forms of protected expression.[9] The parties strenuously dispute whether the Bible Believers' conduct constituted incitement to riot, and they also dispute the level of scrutiny that should be applied to this case. Ultimately, we find that Defendants violated the Bible Believers' First Amendment rights because there can be no legitimate dispute based on this record that the WCSO effectuated a heckler's veto by cutting off the Bible Believers' protected speech in response to a hostile crowd's reaction.

We address the following items in turn: protected versus unprotected speech; the appropriate level of scrutiny to be applied in a public forum given the facts of this case; the precedents upon which the heckler's veto doctrine is built; the rule derived from those precedents; and the rule's application to this case. We then address whether the individual

---

[9]Defendants ostensibly concede that the Bible Believers' speech and expression were protected, but the thrust of their arguments belies their purported concession. Therefore, a discussion of protected versus unprotected speech is merited.

Defendants are liable or, instead, can seek refuge in the affirmative defense of qualified immunity. Finally, we consider whether Wayne County can be held liable for the actions of its law enforcement personnel.

### A.          Protected Speech

The First Amendment offers sweeping protection that allows all manner of speech to enter the marketplace of ideas. This protection applies to loathsome and unpopular speech with the same force as it does to speech that is celebrated and widely accepted. The protection would be unnecessary if it only served to safeguard the majority views. In fact, it is the minority view, including expressive behavior that is deemed distasteful and highly offensive to the vast majority of people, that most often needs protection under the First Amendment. *See, e.g., Nat'l Socialist Party of Am. v. Vill. of Skokie*, 432 U.S. 43, 43–44 (1977) (recognizing First Amendment rights of Neo Nazis seeking to march with swastikas and to distribute racist and anti-Semitic propaganda in a predominantly Jewish community); *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (recognizing the First Amendment rights of Ku Klux Klan members to advocate for white supremacy-based political reform achieved through violent means); *Texas v. Johnson*, 491 U.S. 397, 405–06 (1989) (recognizing flag burning as a form of political expression protected by the First Amendment); *Snyder*, 562 U.S. 443, 454–56 (2011) (recognizing a religious sect's right to picket military funerals). "[I]f it is the speaker's opinion that gives offense, that consequence is a reason for according it constitutional protection." *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 55 (1988) (citation omitted). Religious views are no different. "After all, much political and religious speech might be perceived as offensive to some." *Morse v. Frederick*, 551 U.S. 393, 409 (2007). Accordingly, "[t]he right to free speech . . . includes the right to attempt to persuade others to change their views, and may not be curtailed simply because the speaker's message may be offensive to his audience." *Hill v. Colorado*, 530 U.S. 703, 716 (2000). Any other rule "would effectively empower a majority to silence dissidents simply as a matter of personal predilections," *Cohen v. California*, 403 U.S. 15, 21 (1971), and the government might be inclined to "regulate" offensive speech as "a convenient guise for banning the expression of unpopular views." *Id.* at 26. We tolerate the speech with which we disagree. When confronted by offensive, thoughtless, or baseless speech that we believe to be untrue, the "answer is

[always] more speech." *Williams-Yulee v. Fla. Bar*, 135 S. Ct. 1656, 1684 (2015) (Kennedy, J., dissenting).

Despite the First Amendment's broad sweep, not all speech is entitled to its sanctuary. There are a limited number of categorical exclusions from the comprehensive protection offered by the Free Speech Clause.[10] These exclusions are rooted in history and tradition, and include only those forms of expression that are "long familiar to the bar" as falling outside the confines of First Amendment protection. *United States v. Alvarez*, 132 S. Ct. 2537, 2544 (2012) (plurality opinion) (citation and internal quotation marks omitted). Two areas of unprotected speech that have particular relevance to the interaction between offensive speakers and hostile crowds are "incitement to violence" (also known as "incitement to riot") and "fighting words." Both classes of speech are discussed below.

### 1. Incitement

The right to freedom of speech provides that a state cannot "proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg*, 395 U.S. at 447 (footnote omitted). Advocacy for the use of force or lawless behavior, intent, and imminence, are all absent from the record in this case. The doctrine of incitement has absolutely no application to these facts.

The Bible Believers' speech advocated for their Christian beliefs and for harboring contempt for Islam. This advocacy was purportedly intended to convince Muslims at the Festival that they should convert to Christianity. Regardless of the wisdom or efficacy of this strategy, or of the gross intolerance the speakers' conduct epitomized, disparaging the views of another to support one's own cause is protected by the First Amendment. *See, e.g., Snyder*, 562 U.S. at 454 (placards reading "You're Going to Hell," "Priests Rape Boys," and "God Hates Fags," "certainly convey[ed] . . . [a] position on those issues" and constituted protected speech).

---

[10]Obscenity, *Miller v. California*, 413 U.S. 15 (1973), defamation, *N.Y. Times Co. v. Sullivan*, 376 U.S. 254 (1964), fighting words, *Chaplinsky v. New Hampshire*, 315 U.S. 568 (1942), incitement, *Brandenburg v. Ohio*, 395 U.S. 444 (1969), and information deleterious to national security, *N.Y. Times Co. v. United States*, 403 U.S. 713 (1971).

The only references to violence or lawlessness on the part of the Bible Believers were messages such as, "Islam is a Religion of Blood and Murder," "Turn or Burn," and "Your prophet is a pedophile." These messages, however offensive, do not advocate for, encourage, condone, or even embrace imminent violence or lawlessness. Although it might be inferred that the Bible Believers' speech was intended to anger their target audience, the record is devoid of any indication that they intended imminent lawlessness to ensue. Quite to the contrary, the Bible Believers contacted Wayne County prior to their visit, requesting that the WCSO keep the public at bay so that the Bible Believers could "engage in their peaceful expression."

It is not an easy task to find that speech rises to such a dangerous level that it can be deemed incitement to riot. And unsurprisingly, "[t]here will rarely be enough evidence to create a jury question on whether a speaker was intending to incite imminent crime." Eugene Volokh, *Crime-Facilitating Speech*, 57 Stan. L. Rev. 1095, 1190 (2005).

In *Hess v. Indiana*, the Supreme Court held that a protestor who yelled, "We'll take the fucking street again," amidst an agitated crowd that was already resisting police authority could not be punished for his speech. 414 U.S. 105, 107 (1973). Because "[t]he mere tendency of speech to encourage unlawful acts is not a sufficient reason for banning it," *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 253 (2002), speech that fails to specifically advocate for listeners to take "any action" cannot constitute incitement. *Hess*, 414 U.S. at 109.

Wayne County relies on *Feiner v. New York*, 340 U.S. 315 (1951), to support the proposition that the Bible Believers' speech was subject to sanction, and that such sanction does not offend the Constitution. In *Feiner*, the Supreme Court upheld a conviction for breach of the peace where, in the context of a civil rights rally, a speaker "gave the impression that he was endeavoring to arouse the Negro people against the whites, urging that they rise up in arms and fight for equal rights." *Id.* at 317. The majority, over a vigorous dissent, supported its holding by relying on police testimony that the crowd had become restless, "and there was some pushing, shoving and milling around." *Id.* The majority described the scenario as a "crisis." *Id.* at 321. Thus, it has been said that *Feiner* "endorses a Heckler's Veto." Harry Kalven, Jr., A Worthy Tradition: Freedom of Speech in America 89 (Jamie Kalven ed. 1988).

The better view of *Feiner* is summed up, simply, by the following truism: when a speaker incites a crowd to violence, his incitement does not receive constitutional protection. *See Glasson v. City of Louisville*, 518 F.2d 899, 905 n.3 (6th Cir. 1975) ("For over twenty years the Supreme Court has confined the rule in *Feiner* to a situation where the speaker in urging his opinion upon an audience intends to incite it to take action that the state has a right to prevent."). *Feiner* lends little support for the notion that the Bible Believers' speech amounted to incitement. The Bible Believers did not ask their audience to rise up in arms and fight for their beliefs, let alone request that they hurl bottles and other garbage upon the Bible Believers' heads.

Subsequent Supreme Court precedent illustrates that the speaker's advocacy in *Feiner* itself could no longer be sanctioned as incitement. *See, e.g.*, *United States v. Williams*, 553 U.S. 285, 298–99 (2008) ("To be sure, there remains an important distinction between a proposal to engage in illegal activity and the abstract advocacy of illegality."); *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 928 (1982) ("[T]he mere abstract teaching . . . of the moral propriety or even moral necessity for a resort to force and violence, is not the same as preparing a group for violent action and steeling it to such action." (citation omitted)); *Communist Party of Ind. v. Whitcomb*, 414 U.S. 441, 450 (1974) (rejecting the notion that "any group that advocates violen[ce] . . . as an abstract doctrine must be regarded as necessarily advocating unlawful action"); *see also* 5 Ronald D. Rotunda & John E. Nowak, Treatise on Constitutional Law: Substance and Procedure § 20.39(a) (5th ed. 2013) (noting that "[t]he authority of *Feiner* has been undercut significantly in subsequent [Supreme Court] cases"). In *Claiborne Hardware Co.*, a speaker explicitly proposed to a large crowd that anyone who failed to abide by the terms of an agreed upon boycott would have to be "disciplined." 458 U.S. at 902. The speaker also stated, "If we catch any of you going in any of them racist stores, we're gonna break your damn neck." *Id.* Nonetheless, this speech was not deemed by the Court to be incitement. *Id.* at 928–29.

The Supreme Court has repeatedly referred to *Brandenburg*—not *Feiner*—as establishing the test for incitement. *See, e.g.*, *Whitcomb*, 414 U.S. at 447–48 ("We most recently summarized the constitutional principles that have evolved in this area[—incitement—]in *Brandenburg*."); *Claiborne Hardware Co.*, 458 U.S. at 928 ("The emotionally charged rhetoric of [the plaintiff's] speeches did not transcend the bounds of protected speech set forth in *Brandenburg*."); *see also James v. Meow Media, Inc.*, 300 F.3d 683, 698 (6th Cir. 2002) ("The Court firmly set out the test

for whether speech constitutes unprotected incitement to violence in *Brandenburg*.").    The *Brandenburg* test precludes speech from being sanctioned as incitement to riot unless (1) the speech explicitly or implicitly encouraged the use of violence or lawless action,[11] (2) the speaker intends that his speech will result in the use of violence or lawless action, and (3) the imminent use of violence or lawless action is the likely result of his speech. 395 U.S. at 477.  The Bible Believers' speech was not incitement to riot simply because they did not utter a single word that can be perceived as encouraging violence or lawlessness.  Moreover, there is absolutely no indication of the Bible Believers' subjective intent to spur their audience to violence.  The hostile reaction of a crowd does not transform protected speech into incitement.

### 2.      Fighting Words

A second type of speech that is categorically excluded from First Amendment protection is known as "fighting words."  This category of unprotected speech encompasses words that when spoken aloud instantly "inflict injury or tend to incite an immediate breach of the peace." *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942); *see also Sandul v. Larion*, 119 F.3d 1250, 1255 (6th Cir. 1997).  We rely on an objective standard to draw the boundaries of this category—no advocacy can constitute fighting words unless it is "likely to provoke the *average person* to retaliation."  *Street v. New York*, 394 U.S. 576, 592 (1969) (citation and internal quotation marks omitted) (emphasis added).  Offensive statements made generally to a crowd are not excluded from First Amendment protection; the insult or offense must be directed specifically at an individual.  *R.A.V. v. City of St. Paul*, 505 U.S. 377, 432 (1992) (Stevens, J., concurring); *accord Cohen*, 403 U.S. at 20 (defining fighting words as a "direct personal insult").  The Bible Believers' speech cannot be construed as fighting words because it was not directed at any individual.  Furthermore, the average individual attending the Festival did not react with violence, and of the group made up of mostly adolescents, only a certain percentage engaged in bottle throwing when they heard the proselytizing.

---

[11]Incitement requires, in the view of some constitutional scholars, that "the words used by the speaker *objectively encouraged* and urged and provoked imminent action."  5 Ronald D. Rotunda & John E. Nowak, Treatise on Constitutional Law: Substance and Procedure § 20.15(d) (Online ed. May 2015) (Westlaw subscription) (citing *Hess*, 414 U.S. 105; Volokh, *supra, Crime-Facilitating Speech*).  *Brandenburg*'s plain language (reinforced by *Hess*) requires that the words must, at minimum, implicitly encourage the use of force or lawlessness, or the undertaking of some violent "act"; therefore, we say so explicitly today with little fanfare.

**B.       Free Speech in Public Fora**

Next, we must determine the character of Defendants' actions.  In public fora, the government's rights to "limit expressive activity are sharply circumscribed." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983); *see also Frisby v. Schultz*, 487 U.S. 474, 480 (1988) (public streets are the "archetype of a traditional public forum").  Speech restrictions in these fora fall into two categories: content-based restrictions or time, place, and manner restrictions that are content-neutral. *United States v. Grace*, 461 U.S. 171, 177 (1983); *Saieg*, 641 F.3d at 734.  The parties' dispute is centered on whether Wayne County's actions were content neutral—a distinction that determines the applicable level of constitutional scrutiny. *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 290 (6th Cir. 1998).

"Listeners' reaction to speech is not a content-neutral basis for regulation," *Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123, 134 (1992), or for taking an enforcement action against a peaceful speaker.  *See Brown v. Louisiana*, 383 U.S. 131, 133 n.1 (1966) ("Participants in an orderly demonstration in a public place are not chargeable with the danger . . . that their critics might react with disorder or violence."); *Glasson*, 518 F.2d at 905.  Therefore, we find that Wayne County's actions were decidedly content-based.  It is indisputable that the WCSO acted against the Bible Believers in response to the crowd's negative reaction.  Deputy Chief Richardson told Israel, "your conduct especially is causing this disturbance;" "part of the reason they throw this stuff . . . is that you tell them stuff that enrages them;" "apparently what you are saying to them and what they are saying back to you is creating danger;" and therefore, "[i]f you don't leave we're gonna cite you for disorderly."

The sum of Wayne County's counter-argument to the charge that the Bible Believers' expulsion was motivated by the views they espoused is merely that the WCSO Operations Plan was content-neutral, and that the WCSO's only consideration was maintaining the public safety. This contention fails in the face of abundant evidence that the police have effectuated a heckler's veto.  It is irrelevant whether the Operations Plan is content-neutral because the officers enforcing it are ordained with broad discretion to determine, based on listener reaction, that a particular expressive activity is creating a public danger. *Cf. Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 97 (1972) ("[B]ecause of their potential use as instruments for selectively

suppressing some points of view, this Court has condemned licensing schemes that lodge broad discretion in a public official to permit speech-related activity."); *see also Ctr. for Bio-Ethical Reform, Inc. v. L.A. Cty. Sheriff Dep't*, 533 F.3d 780, 787 (9th Cir. 2008) ("If the statute, as read by the police officers on the scene, would allow or disallow speech depending on the reaction of the audience, then the ordinance would run afoul of an independent species of prohibitions on content-restrictive regulations, often described as a First Amendment-based ban on the 'heckler's veto.'" (citing *Bachellar v. Maryland*, 397 U.S. 564, 567 (1970))).

## C.      The Heckler's Veto and Police Obligations

It is a fundamental precept of the First Amendment that the government cannot favor the rights of one private speaker over those of another. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995). Accordingly, content-based restrictions on constitutionally protected speech are anathema to the First Amendment and are deemed "presumptively invalid." *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 358 (2009). An especially "egregious" form of content-based discrimination is that which is designed to exclude a particular point of view from the marketplace of ideas. *Rosenberger*, 515 U.S. at 829; *Perry Educ. Ass'n*, 460 U.S. at 62 (Brennan, J., dissenting) ("Viewpoint discrimination is censorship in its purest form and government regulation that discriminates among viewpoints threatens the continued vitality of 'free speech.'"). The heckler's veto is precisely that type of odious viewpoint discrimination. *Cf. Police Dep't of Chi.*, 408 U.S. at 98 ("'[T]o deny this . . . group use of the streets because of their views . . . amounts . . . to an invidious discrimination.'" (quoting *Cox*, 379 U.S. at 581 (Black, J., concurring))).

Both content- and viewpoint-based discrimination are subject to strict scrutiny. *McCullen v. Coakley*, 134 S. Ct. 2518, 2530, 2534 (2014). No state action that limits protected speech will survive strict scrutiny unless the restriction is narrowly tailored to be the least-restrictive means available to serve a compelling government interest. *United States v. Playboy Entm't Grp.*, 529 U.S. 803, 813 (2000). Punishing, removing, or by other means silencing a speaker due to crowd hostility will seldom, if ever, constitute the least restrictive means available to serve a legitimate government purpose. *Cantwell v. Connecticut*, 310 U.S. 296 (1940); *Terminiello v. City of Chi.*, 337 U.S. 1 (1949); *Edwards v. South Carolina*, 372 U.S. 229 (1963); *Cox v.*

*Louisiana*, 379 U.S. 536 (1965); *Gregory v. City of Chi.*, 394 U.S. 125 (1969). A review of Supreme Court precedent firmly establishes that the First Amendment does not countenance a heckler's veto.

### 1.            Early Cases: Clear and Present Danger

The "clear and present danger" test, first articulated by Justice Holmes in *Schenck v. United States*, 249 U.S. 47 (1919), is a flexible means to protect speech while recognizing that the government might have legitimate reasons for imposing speech-restrictions due to exigent circumstances:

> The question in every case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent. It is a question of proximity and degree.

249 U.S. at 52.[12] The Supreme Court in *Cantwell v. Connecticut* and in *Terminiello v. City of Chicago* utilized the clear and present danger test to establish the rights of speakers not to be silenced on account of listeners' hostility toward their message.

In *Cantwell*, a Jehovah's Witness was convicted for inciting a breach of the peace after going into a predominantly Catholic neighborhood and playing (to bypassers who were willing to listen) a phonograph recording that demonized Catholicism. 310 U.S. at 302–03, 309. Two listeners of the recording were so offended that they threatened the Witness that he better leave or face violent retaliation. *Id.* at 309. The Court recognized that with religion and politics in particular, "[t]o persuade others to his own point of view, the pleader, as we know, at times, resorts to exaggeration, to vilification of men who have been, or are, prominent in church or state, and even to false statement." *Id.* at 310. Invoking the now-familiar clear and present danger test, the Court found that the expressive activity did not fall outside of the confines of free speech protection and therefore it could not lawfully be penalized by the state. *Id.* at 310–11.

---

[12]Although this test was first introduced by Justice Holmes to uphold convictions of wartime dissenters under the speech-repressive Espionage and Sedition Acts, Holmes continued to invoke this language in dissent throughout the 1920s as a means to protect political speech, until it became firmly established as the governing rule following its use in Justice Brandeis' famous concurrence in *Whitney v. California*, 274 U.S. 357 (1927)—the foundation of all modern First Amendment jurisprudence. David L. Hudson, Jr., *Legal Almanac: The First Amendment: Freedom of Speech* § 1:4 (Oct. 2012).

In *Terminiello*, the Supreme Court again applied the clear and present danger test to overturn a conviction based on a statute that allowed the state to punish speech based on crowd hostility—*i.e.* a heckler's veto. 337 U.S. at 4–5. The hostility was quite real in that instance, as the crowd had gathered outside the auditorium and begun throwing icepicks, bottles, and rocks, in response to the speaker's remarks. *Id.* at 15 (Jackson, J., dissenting). Justice Douglas wrote for the Court that "freedom of speech, though not absolute, is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest." 337 U.S. at 4 (citations omitted). He noted that constitutionally protected speech "may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea." *Id.* Therefore, the state cannot sanction speech, consistent with the Constitution, solely on the basis that it "stirred people to anger, invited public dispute, or brought about a condition of unrest." *Id.* at 5.

*Cantwell* and *Terminiello* instruct that offensive religious proselytizing, as well as speech that drives a crowd to extreme agitation, is not subject to sanction simply because of the violent reaction of offended listeners. *Feiner* came shortly after these cases, and it highlighted a significant flaw with the clear and present danger test in this context; chiefly, "it allows an audience reaction, if hostile enough, to be a basis for suppressing a speaker." Erwin Chemerinsky, Constitutional Law: Principles and Policies 1041 (4th ed. 2011). The Supreme Court recognized this flaw and eschewed any reliance on the clear and present danger test in the civil-rights era cases involving hostile crowds. *See, e.g.*, *Gregory*, 394 U.S. at 112–13. Those cases reasserted, as paramount, the right of the speaker to not be silenced.

### 2.        Civil-Rights Era: Protect the Speaker

In *Edwards v. South Carolina*, 187 black college and high school students were convicted for breach of the peace following a peaceful protest, where, in small groups, the students marched to the Columbia, South Carolina state house carrying placards bearing messages in support of equality and civil rights. 372 U.S. at 229–30. During the demonstration, between 200 and 300 white observers gathered in a horseshoe around the students. *Id.* at 231. The police threatened the students with arrest after "apprehend[ing] immin[ent] violence" by a number of

troublemakers in the crowd of onlookers. *Id.* at 245 (Clark, J., dissenting); *id.* at 231 & n.4 (majority opinion). The Supreme Court reversed the convictions, distinguished *Feiner* as being a case involving incitement, and reaffirmed *Terminiello* by recognizing that expressive activity cannot be proscribed merely because it "'stirred people to anger, invited public dispute, or brought about a condition of unrest.'" *Id.* at 238 (quoting *Terminiello*, 337 U.S. at 5).

Similarly, in *Cox v. Louisiana*, a student civil rights organizer led 2,000 fellow students in a peaceful protest outside of a courthouse in downtown Baton Rouge. 379 U.S. at 538–40. Approximately 100 to 300 white onlookers gathered to watch the protest. *Id.* at 541. When the student leader suggested to the protestors that they stage a sit-in at the segregated lunch counters in town, the crowd of onlookers reacted with jeers and became agitated. *Id.* at 550. Police feared that "violence was about to erupt" from the crowd of onlookers and dispersed the student protestors with a canister of tear gas, arresting the student leader the following day for breach of the peace. *Id.* at 548, 550 n.12. The Supreme Court invoked *Edwards*, noting that the "evidence showed no more than that the opinions which the students were peaceably expressing were sufficiently opposed to the views of the majority of the community to attract a crowd and necessitate police protection," and overturned the conviction because "constitutional rights may not be denied simply because of hostility to their assertion or exercise." *Id.* at 551 (citation, brackets, and internal quotation marks omitted).

Finally, in *Gregory v. City of Chicago*, a group of civil rights protestors peacefully marched around the Mayor of Chicago's home to draw attention to and air their frustration with the slow pace of integration in Chicago's public schools. 394 U.S. at 111. The protestors were assaulted by onlookers with rocks and eggs, despite "a determined effort by the police to allow the marchers to peacefully demonstrate." *Id.* at 117 (Black, J., concurring). The protestors hurled invective back at their hecklers, but otherwise "maintained a decorum that sp[oke] well for their determination simply to" exercise their constitutional rights. *Id.* The police determined that the hecklers "were dangerously close to rioting," and therefore ordered the protestors to leave. *Id.* at 120. They were charged with and convicted of breach of the peace for refusing to vacate. *Id.* The Court, in a plurality opinion, called it a "simple case" because due process does not allow for a conviction for breach of the peace where there is no evidence that the protestors were themselves disorderly. *Id.* at 112. Justice Black, joined by Justice Douglas in his

concurrence, reaffirmed *Edwards* and *Cox* as controlling, inasmuch as the state cannot punish a speaker simply because his lawful speech has attracted an angry mob of hecklers. *Id.* at 123–24, 124 n.8.

The civil-rights era cases tell us that police cannot punish a peaceful speaker as an easy alternative to dealing with a lawless crowd that is offended by what the speaker has to say. Because the "right 'peaceably to assemble, and to petition the Government for a redress of grievances' is specifically protected by the First Amendment," *Gregory*, 394 U.S. at 119 (Black, J., concurring), the espousal of views that are disagreeable to the majority of listeners may at times "necessitate police protection," *Edwards*, 372 U.S. at 237. "Liberty can only be exercised in a system of law which safeguards order." *Cox*, 379 U.S. at 574. It is "a police officer's . . . duty . . . to enforce laws already enacted and to make arrests . . . for conduct already made criminal." *Gregory*, 394 U.S. at 120 (Black, J., concurring). Therefore, the natural order of law enforcement and crime mitigation are not upended simply because community hostility makes it easier to act against the speaker rather than the individuals actually breaking the law; this is true when it appears that a crowd may turn to rioting, *Cox*, 379 U.S. at 588, or even in the face of actual violence that was indiscriminately directed, *Gregory*, 394 U.S. at 129 ("The police were dodging the rocks and eggs" along with the protestors) (Appendix to Opinion of Black, J., concurring).

### 3.          Sixth Circuit Precedent: *Glasson* and Damages Liability

In the decade following this string of Supreme Court precedents, a heckler's veto case came before the Sixth Circuit. *See Glasson v. City of Louisville*, 518 F.2d 899 (6th Cir. 1975). *Glasson* recognized, consistent with the aforementioned precedents, that "[a] police officer has the duty not to ratify and effectuate a heckler's veto nor may he join a moiling mob intent on suppressing ideas." *Id.* at 906.

The dispute in *Glasson* originated when a speaker intent on voicing her displeasure with the Vietnam War, as well as the issues of racism and poverty in America, displayed a placard reflecting her grievances while waiting on a motorcade route for then-President Richard M. Nixon. *Id.* at 901. One of the police officers responsible for crowd control noticed that a group of Nixon supporters on the opposite side of the street became agitated, started hollering, and

were likely to riot, after perceiving the poster. *Id.* at 902. Instead of reprimanding the rabble-rousing crowd, the officer destroyed the speaker's poster after she refused to hide it from view. *Id.*

The police officer's actions in *Glasson* were a patent violation of the speaker's First Amendment rights, because the speaker did not "somehow forfeit[] the protection afforded her message by the Constitution because it unintentionally evoked a hostile reaction from others." *Id.* at 905. However, this Court's inquiry in *Glasson* did not end there; the officers were entitled to seek shelter from damages by way of qualified immunity—then framed as a good faith defense. *Id.* at 907. This defense was applicable if the officer acted reasonably under the circumstances and in good faith. *Id.* With respect to reasonableness in the context of free speech and unruly hecklers, *Glasson* states:

> Ideally, police officers will always protect to the extent of their ability the rights of persons to engage in First Amendment activity. Yet, the law does not expect or require them to defend the right of a speaker to address a hostile audience, however large and intemperate, when to do so would unreasonably subject them to violent retaliation and physical injury. In such circumstances, they may discharge their duty of preserving the peace by intercepting his message or by removing the speaker for his own protection without having to respond in damages.

*Id.* at 909.[13] Ultimately, the *Glasson* Court held that the officers could not claim the shelter of the good-faith defense because (1) it was the hecklers who posed the threat, and not the speaker (if any threat existed at all); (2) a favorable number of other officers (relative to the size of the crowd) were nearby and available to assist if called upon; and (3) had that number of officers been insufficient to accomplish the task, reinforcements should have been called before they chose to take action against the speaker. *Id.* at 910–11.

### 4.     Constitutional Rule: No Heckler's Veto

The Supreme Court, in *Cantwell*, *Terminiello*, *Edwards*, *Cox*, and *Gregory*, has repeatedly affirmed the principle that "constitutional rights may not be denied simply because of

---

[13]This rule allowing for police to be free from damages even when they silence the speaker so long as they acted reasonably is derived from Justice Frankfurter's concurring opinion in *Feiner*. *See Niemotko v. Maryland*, 340 U.S. 268, 289 (1951) (Frankfurter, J., concurring and concurring in *Feiner v. New York*, 340 U.S. 315).

hostility to their assertion or exercise." *Watson v. City of Memphis*, 373 U.S. 526, 535 (1963) (citations omitted). If the speaker's message does not fall into one of the recognized categories of unprotected speech,[14] the message does not lose its protection under the First Amendment due to the lawless reaction of those who hear it. Simply stated, the First Amendment does not permit a heckler's veto.

In this Circuit, a modicum of confusion is understandable with respect to the prohibition against the heckler's veto due to *Glasson*'s discussion of a good-faith affirmative defense. However, this defense is inconsistent with subsequent Supreme Court precedent, with the strict scrutiny that must be applied to content-based discrimination, and with the superseding affirmative defense to a § 1983 suit—qualified immunity.[15] Therefore, to the extent that *Glasson*'s good-faith defense may be interpreted as altering the substantive duties of a police officer not to effectuate a heckler's veto, it is overruled. *See Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982) ("By defining the limits of qualified immunity essentially in objective terms, we provide no license to lawless conduct.").

In a balance between two important interests—free speech on one hand, and the state's power to maintain the peace on the other—the scale is heavily weighted in favor of the First Amendment. *See, e.g., Terminiello*, 337 U.S. at 4. Maintenance of the peace should not be achieved at the expense of the free speech. The freedom to espouse sincerely held religious, political, or philosophical beliefs, especially in the face of hostile opposition, is too important to our democratic institution for it to be abridged simply due to the hostility of reactionary listeners who may be offended by a speaker's message. If the mere possibility of violence were allowed to dictate whether our views, when spoken aloud, are safeguarded by the Constitution, surely the myriad views that animate our discourse would be reduced to the "standardization of ideas . . . by . . . [the] dominant political or community groups." *Id.* at 4–5. Democracy cannot survive such a deplorable result.

When a peaceful speaker, whose message is constitutionally protected, is confronted by a hostile crowd, the state may not silence the speaker as an expedient alternative to containing or

---

[14]*See* footnote 10.

[15]Qualified immunity and the good-faith defense are discussed in greater detail in Part IV of this opinion.

snuffing out the lawless behavior of the rioting individuals. *See Watson*, 373 U.S. at 535–36. Nor can an officer sit idly on the sidelines—watching as the crowd imposes, through violence, a tyrannical majoritarian rule—only later to claim that the speaker's removal was necessary for his or her own protection. "[U]ncontrolled official suppression of the privilege [of free speech] cannot be made a substitute for the duty to maintain order in connection with the exercise of th[at] right." *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 516 (1939). If the speaker, at his or her own risk, chooses to continue exercising the constitutional right to freedom of speech, he or she may do so without fear of retribution from the state, for the speaker is not the one threatening to breach the peace or break the law. However, the Constitution does not require that the officer "go down with the speaker."[16] If, in protecting the speaker or attempting to quash the lawless behavior, the officer must retreat due to risk of injury, then retreat would be warranted. The rule to be followed is that when the police seek to enforce law and order, they must do so in a way that does not unnecessarily infringe upon the constitutional rights of law-abiding citizens. *See Gregory*, 394 U.S. at 120 ("[A] police officer['s] . . . duty is to enforce laws already enacted and to make arrests . . . for conduct already made criminal.") (Black, J., concurring). The police may go against the hecklers, cordon off the speakers, or attempt to disperse the entire crowd if that becomes necessary. Moreover, they may take any appropriate action to maintain law and order that does not destroy the right to free speech by indefinitely silencing the speaker. Fundamentally, no police action that hinders the speaker's freedom of speech should be deemed legitimate in the eyes of the Constitution unless it satisfies strict scrutiny, which requires the police to achieve their ends by using only those means that are the least restrictive with respect to the speaker's First Amendment rights.

"[T]he Constitution demands that content-based restrictions on speech be presumed invalid and that the [g]overnment bear the burden of showing their constitutionality." *Alvarez*, 132 S. Ct. at 2544 (citation, internal quotation marks, and ellipses omitted). Wayne County has not come close to meeting that burden in this case. There was a force of approximately fifty officers at the Festival—nineteen of whom were purposely unassigned so that they could respond to changing circumstances. A crowd made up predominantly of adolescents began hurling plastic bottles and other trash at the Bible Believers. Law enforcement officers, despite their

---

[16]Kalven, *supra*, The Negro and the First Amendment, at 140.

numbers, were virtually nowhere to be found, save for a few brief appearances. One of these appearances was solely for the purpose of telling the Bible Believers that they could no longer use their megaphone. At a later encounter, an officer came over not to reprimand the troublemakers, but to inform the Bible Believers that they were free to leave the Festival. Each time that an officer appeared, the adolescents' lawless behavior relented, despite the lack of official reprimand. Throughout the harassment and violence directed at them, the Bible Believers remained calm and peaceful. While the Deputy Chiefs conferred with Corporation Counsel, and prior to the Bible Believers being forced to leave the Festival, there were approximately a dozen officers milling about in the background. Many of those officers were sufficiently unoccupied to follow the Bible Believers and observe their fellow officer ticket them for driving a vehicle without a license plate. By the WCSO's own admission in its post-operation report, the totality of the officers' attempt to enforce the law constituted only a few verbal warnings being directed at the lawless adolescents and one individual being cited.

Wayne County disputes the sufficiency of their manpower to quell the crowd, but this contention is specious. The video record evinces next to no attempt made by the officers to protect the Bible Believers or prevent the lawless actions of the audience. The record also indicates a substantial police presence that went virtually unused. Wayne County claimed to have assigned more law enforcement personnel to the Festival than had previously been assigned to crowd control when the President of the United States visited the area. We cannot justifiably set the bar so low for the police officers sworn to protect our communities (and occasionally the President) that there is any debate as to whether it is reasonable that the result of a purportedly sincere effort to maintain peace among a group of rowdy youths is few verbal warnings and a single arrest.[17]

---

[17]Judge Gibbons' dissent makes much of the presence of actual—as opposed to potential—violence directed at the Bible Believers by the adolescent audience. Gibbons Dis. 53–54. However, the dissent's unsupported, hyperbolic account of the Bible Believers as "bruised and bloodied," Gibbons Dis. 54, ignores any responsibility on the part of the WCSO to use some small part of its police force, and the aura of authority with which a sheriff's office is imbued, to attempt to protect the Bible Believers from the lawless behavior of the crowd. Similarly, because the WSCO made no genuine efforts to utilize its officers to prevent or punish the unlawful behavior of the adolescents, it is unfair, on this record, to characterize the crowd's conduct as "undeterred by police presence." Gibbons Dis. 54.

We do not presume to dictate to law enforcement precisely how it should maintain the public order. But in this case, there were a number of easily identifiable measures that could have been taken short of removing the speaker: *e.g.*, increasing police presence in the immediate vicinity, as was requested; erecting a barricade for free speech, as was requested; arresting or threatening to arrest more of the law breakers, as was also requested; or allowing the Bible Believers to speak from the already constructed barricade to which they were eventually secluded prior to being ejected from the Festival. If none of these measures were feasible or had been deemed unlikely to prevail, the WCSO officers could have called for backup—as they appear to have done when they decided to eject the Bible Believers from the Festival—prior to finding that it was necessary to infringe on the group's First Amendment rights. We simply cannot accept Defendants' position that they were compelled to abridge constitutional rights for the sake of public safety, when at the same time the lawless adolescents who caused the risk with their assaultive behavior were left unmolested.[18]

The Bible Believers attended the Festival to exercise their First Amendment rights and spread their religious message. The way they conveyed their message may have been vile and offensive to most every person who believes in the right of their fellow citizens to practice the faith of his or her choosing; nonetheless, they had every right to espouse their views. *See Cantwell*, 310 U.S. at 309 ("The record played . . . would offend not only persons of [the Catholic] persuasion, but all others who respect the honestly held religious faith of their fellows."). When the message was ill-received, the police did next to nothing to protect the Bible Believers or to contain the lawlessness of the hecklers in the crowd. Instead, the WCSO accused the Bible Believers of being disorderly and removed them from the Festival.[19] On this

---

[18]In his dissent, Judge Rogers maintains that when assessing whether to cut off speech being made to a hostile crowd, law enforcement should be permitted to "tak[e] into account all of the factors" they routinely consider in keeping the peace, including "the nature of the crowd, the resources available to police at the time, and other factors bearing on law enforcement's ability to control the scene around a speaker." Rogers Dis. 64. We hold the same. On this point, the difference between our view and that of Judge Rogers is that Judge Rogers believes that the WCSO chose a constitutional course of conduct after considering these factors, and we find that they did not.

[19]Contrary to Judge Rogers' assertion, Rogers Dis. 62–63, the video record indicates that the WCSO threatened to cite the Bible Believers for disorderly conduct not due to any purported failure to obey a police order, but based on the unrest created by their speech. (R. 28-A, Raw Festival Footage, Time: 00:53:41 (Officer Richardson: "I'm not telling you that you're going to be arrested, but, you know, you are a danger to the public safety. You're disorderly."); *id*. at 00:54:58 ("Alright, you need to leave . . . . If you don't leave we're going to cite you for disorderly. You are creating a disturbance . . . I mean look at your people here . . . This is crazy.").

record, there can be no reasonable dispute that the WCSO effectuated a heckler's veto, thereby violating the Bible Believers' First Amendment rights.

In his dissent from this part of our holding, Judge Griffin opines that although *Cantwell* and *Terminiello* clearly established that police officers may not effectuate a heckler's veto on behalf of an irate mob, "those precedents left unanswered whether the police effectuate a heckler's veto when they remove a speaker for his own safety rather than because of the content of the speech or its supposed effect on the crowd." Griffin Dis. at 46–47. Fortunately, *Cantwell* and *Terminiello* were not the last cases to speak on the issue of a heckler's veto, and later cases have made clear that excluding a speaker from a public forum, under most circumstances, will not constitute the least restrictive means for coping with a crowd's hostile reaction to her constitutionally protected speech. *See supra* Part I.C. Such a result comports with the high premium this nation places on speech safeguarded by the First Amendment.

Notably, a heckler's veto effectuated by the police will nearly always be susceptible to being reimagined and repackaged as a means for protecting the public, or the speaker himself, from actual or impending harm. After all, if the audience is sufficiently incensed by the speaker's message and responds aggressively or even violently thereto, one method of quelling that response would be to cut off the speech and eject the speaker whose words provoked the crowd's ire. Our point here is that before removing the speaker due to safety concerns, and thereby permanently cutting off his speech, the police must first make bona fide efforts to protect the speaker from the crowd's hostility by other, less restrictive means. Although *Glasson* made that requirement clear, and framed the removal of the speaker for his own protection as a last resort to be used only when defending the speaker "would unreasonably subject [officers] to violent retaliation and physical injury," 518 F.2d at 909, the WCSO made no discernible efforts to fulfill this obligation.

## II.    The First Amendment and Free Exercise

We next consider the Bible Believers' claim that Wayne County violated their right to the free exercise of religion. The right to free exercise of religion includes the right to engage in conduct that is motivated by the religious beliefs held by the individual asserting the claim.

*Prater v. City of Burnside*, 289 F.3d 417, 427 (6th Cir. 2002).  The government cannot prohibit an individual from engaging in religious conduct that is protected by the First Amendment.  *Id.*

The Bible Believers' proselytizing at the 2012 Arab International Festival constituted religious conduct, as well as expressive speech-related activity, that was likewise protected by the Free Exercise Clause of the First Amendment.  *Murdock v. Pennsylvania*, 319 U.S. 105, 108–10 (1943).  Plaintiff Israel testified that he was required "to try and convert non-believers, and call sinners to repent" due to his sincerely held religious beliefs.  We do not question the sincerity of that claim.  *Fowler v. Rhode Island*, 345 U.S. 67, 70 (1953) ("[I]t is no business of courts to say that what is a religious practice or activity for one group is not religion under the protection of the First Amendment."); *cf. Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2778 (2014) ("[T]he federal courts have no business addressing whether the religious belief asserted in a RFRA case is reasonable." (internal parentheses omitted)).

Free exercise claims are often considered in tandem with free speech claims and may rely entirely on the same set of facts.  *See, e.g.*, *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton*, 536 U.S. 150 (2002); *Rosenberger*, 515 U.S. at 841.  Defendants prevented the Bible Believers from proselytizing based exclusively on the crowd's hostile reaction to the religious views that the Bible Believers were espousing.  Therefore, the free exercise claim succeeds on the same basis as the free speech claim.  *See Watchtower Bible*, 536 U.S. at 150, 159 n.8.

## III.    The Fourteenth Amendment and Equal Protection

The next inquiry is with respect to the Bible Believers' equal protection claim.  We have held that:

> The Equal Protection Clause of the Fourteenth Amendment commands that no state shall . . . deny to any person within its jurisdiction the equal protection of the laws.  To state an equal protection claim, a plaintiff must adequately plead that the government treated the plaintiff disparately as compared to similarly situated persons and that such disparate treatment . . . burdens a fundamental right, targets a suspect class, or has no rational basis.

*Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011) (citations and internal quotation marks omitted).  Freedom of speech is a fundamental right.  *Lac Vieux Desert Band of Lake Chippewa Indians v. Mich. Gaming Control Bd.*, 172 F.3d 397, 410 (6th Cir.

1999).  Therefore, Wayne County's actions are subject to strict scrutiny.  *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 16 (1973).  "In determining whether individuals are 'similarly situated,' a court should not demand exact correlation, but should instead seek relevant similarity."  *Bench Billboard Co. v. City of Cincinnati*, 675 F.3d 974, 987 (6th Cir. 2012) (internal quotation marks omitted).

The Festival included a number of other religious organizations that came to share their faith by spreading a particular message.  There are several distinctions between the Bible Believers and these other groups.  Mainly, the Bible Believers chose, as was their right, not to register for an assigned table under the information tent.  Instead, they paraded through the Festival and proselytized, as was also their right, while carrying signs and a severed pig's head.  Although these actions set them apart from the other speakers and religious organizations at the Festival, they do not do so in any relevant respect.  Any speaker could have walked the Festival grounds with or without signs if they chose to do so.  The Bible Believers, like the other religious organizations at the Festival, sought to spread their faith and religious message.  Although they declined to utilize the tent set aside for outside groups, their conduct was at all times peaceful while they passionately advocated for their cause, much like any other religious group.  Wayne County did not threaten the Bible Believers based on their decision to march with signs and banners, but based on the content of the messages displayed on the signs and banners.  The county's disparate treatment of the Bible Believers was based explicitly on the fact that the Bible Believers' speech was found to be objectionable by a number of people attending the Festival.  Wayne County therefore violated the Bible Believers' right to equal protection by treating them in a manner different from other speakers, whose messages were not objectionable to Festival-goers, by burdening their First Amendment rights.  *See Napolitano*, 648 F.3d at 379.

## IV.     Qualified Immunity

Whether Deputy Chiefs Richardson and Jaafar can be held liable for civil damages is a separate question from whether their actions violated the Constitution.[20]  Although *Glasson*

---

[20]The Bible Believers are entitled to injunctive relief irrespective of the damages inquiry. *See Harlow*, 457 U.S. at 818 ("[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages"); *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998) (noting that qualified immunity is not available in "a suit to enjoin future conduct"); *see also Cannon v. City & Cty. of Denver*, 998 F.2d 867, 876 (10th

spoke about a good-faith defense, qualified immunity—announced seven years after *Glasson* in *Harlow v. Fitzgerald*—is the presently available affirmative defense for government officials subject to liability under § 1983. In *Harlow*, the Supreme Court removed the subjective element from the then-existing affirmative defense for government actors—the good faith inquiry. *Harlow*, 457 U.S. at 819 ("By defining the limits of qualified immunity essentially in objective terms, we provide no license to lawless conduct."); *see also Ohio Civil Serv. Emps. Assoc. v. Seiter*, 858 F.2d 1171, 1173 (6th Cir. 1988) ("The law of qualified immunity was dramatically changed by the Court in *Harlow v. Fitzgerald*.").

Pursuant to *Harlow*, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." 457 U.S. at 818. This standard presupposes two things: first, that the facts alleged by the plaintiff are sufficient to state a constitutional claim; and second, that the constitutional right which the officer has purportedly violated was clearly established at the time of the harm giving rise to the action. *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001), *abrogated by Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (holding that although the two-step inquiry set out in *Saucier* "is often beneficial," courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first"). Having already found that the Deputy Chiefs effectuated an unconstitutional heckler's veto, we need only decide whether their actions violated law that was clearly established at the time of the 2012 Festival. Whether a point of law is clearly established necessarily turns on its breadth—*i.e.*, the level of specificity at which it is defined. *See Reichle v. Howards*, 132 S. Ct. 2088, 2094 (2012) ("[T]he right allegedly violated must be established not as a broad general proposition, but in a particularized sense so that the contours of the right are clear to a reasonable official." (citations and internal quotation marks omitted)). Although "existing precedent must have placed the . . . constitutional question beyond debate," "[a] case directly on point," is not a prerequisite to finding that a law is clearly established. *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011).

---

Cir. 1993) ("The protestors also seek declaratory and injunctive relief against the officers. Unlike the claim for money damages, there is no qualified immunity to shield the defendants from claims for these types of relief."); *Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 527 (9th Cir. 1989) ("Qualified immunity . . . does not bar actions for declaratory or injunctive relief.").

Deputy Chief Defendants Richardson and Jaafar contend that, "no 'clearly established' law existed on the subject of correct law enforcement response to a situation where speakers may or may not be engaged in protected speech, the audience in proximity to the speech reacts violently, and the deputies do not have sufficient manpower to restrain the audience, to protect the speakers, and to ensure their own safety." *See Appellee Supp. Br.* at 21–23. The Deputy Chiefs' position is untenable and unsupported by the record. As is evident from the Supreme Court opinions detailed above, and as explicitly stated in *Glasson*, "[a] police officer has the duty not to ratify and effectuate a heckler's veto . . . . Instead, he must take reasonable action to protect from violence persons exercising their constitutional rights." 518 F.2d at 906. Defendants were specifically put on notice of this requirement, insofar as the Bible Believers quoted this precise language in a letter that was sent to Wayne County.

To the extent that *Glasson*'s discussion of a good-faith defense confused the issue of whether a heckler's veto constitutes a constitutional violation, the facts and analysis in *Glasson* nonetheless alerted Defendants that removing a peaceful speaker, when the police have made no serious attempt to quell the lawless agitators, could subject them to liability. In *Glasson*, the Court rejected the officers' claims that the size of their force was insufficient to quell the hecklers that were purportedly "near to riot." *Id.* at 910. The Court explicitly stated the requirement that the police "take *reasonable* action to protect from violence persons exercising their constitutional rights," *id.* at 906 (emphasis added), and found the officers' actions unreasonable because they failed to call for reinforcements and failed to recognize the speaker's right to be protected from violence. *Id.* at 910. These facts are substantially the same as those before us today.

Defendants emphasize the fact that *Glasson* involved an officer tearing up a sign in response to agitated hecklers, as opposed to officers removing a speaker in an attempt to quell an angry crowd that was actually engaged in violent retaliation. These distinctions are immaterial. The violence here was not substantial, much less overwhelming, and speech, whether it be oration or words written on a poster, is speech nonetheless. Moreover, this case was also about removing from view signs that were considered offensive by a group of hecklers—as Israel informed the Deputy Chiefs, his group was no longer preaching during the latter portion of the onslaught against them. Finally, it should be noted that *Glasson* involved a more compelling

state interest—protection of the President—yet the officers' actions were still deemed to be unreasonable. *See Wood v. Moss*, 134 S. Ct. 2056, 2061 (2014) (citing *Watts v. United States*, 394 U.S. 705, 707 (1969)) ("[S]afeguarding the President is . . . of overwhelming importance in our constitutional system.").

Had the Bible Believers refused to leave, and consequently been arrested, charged, and convicted of disorderly conduct, the convictions could certainly be held invalid pursuant to *Gregory*.[21] The Bible Believers' decision to comply with the police officers' demands, under threat of arrest for disorderly conduct—as opposed to the speaker's decision in *Gregory* to disregard the officer's command—cannot stand for the proposition that there was no clearly established law as to whether the police may threaten to arrest a peaceful speaker in order to calm a hostile crowd of hecklers.[22]   *Gregory*, like this case, involved protestors who used offensive language and, in response, were assaulted with debris by a violent crowd of hecklers.

[21] Disorderly conduct is governed by Mich. Comp. Laws § 750.167.  The only provision of this statute that is at all remotely relevant to the Bible Believers' conduct is subsection (*l*), which reads: "A person who is found jostling or roughly crowding people unnecessarily in a public place."  As in *Gregory*:

> The so-called 'diversion tending to a breach of the peace' . . . was limited entirely and exclusively to the fact that when the policeman in charge of the special police detail concluded that the hecklers observing the march were dangerously close to rioting and that the demonstrators and others were likely to be engulfed in that riot, he ordered Gregory and his demonstrators to leave, and Gregory—standing on what he deemed to be his constitutional rights—refused to do so. . . . [T]he conduct involved here could become 'disorderly' only if the policeman's command was a law which the petitioners were bound to obey at their peril.  But under our democratic system of government, lawmaking is not entrusted to the moment-to-moment judgment of the policeman on his beat. . . . To let a policeman's command become equivalent to a criminal statute comes dangerously near making our government one of men rather than of laws.  There are ample ways to protect the domestic tranquility without subjecting First Amendment freedoms to such a clumsy and unwieldy weapon.

*Gregory*, 394 U.S. at 120–21 (Black, J., concurring) (citations omitted).

[22] Judge Gibbons' dissent maintains that the clearly established right on which we base our holding is a speaker's "specific right . . . to be free from an effective removal when his safety and the safety of others have been compromised by an unforeseen violent mob occasioning physical injury on both the speaker and innocent bystanders."  Gibbons Dis. 52.  This statement both misapprehends our holding and mischaracterizes the record.  With regard to the factual inaccuracies, there is no indication that anyone other than the Bible Believers themselves, including any so-called "innocent bystanders," suffered physical injury as a result of the audience's hostile reaction to the group's proselytizing.  Further, after the first bottle was thrown, and the Bible Believers informed the officer objecting to their use of the megaphone that they were being pelted with garbage by the adolescent crowd, there was nothing "unforesee[able]" about the risk of further aggression from this particular audience.  In terms of legal misconceptions, contorting our opinion to hold that a constitutional violation *inevitably* occurs when a speaker is removed after his safety has been compromised by a lawless mob ignores our emphasis on law enforcement's obligation to attempt to prevent violence occasioned by unruly crowds—as the law enforcement agency's resources permit—before resorting to cutting off constitutionally protected speech.  This order of operations, which first requires officers to make sincere efforts to maintain order and protect the speaker, assures that law enforcement's conduct is narrowly tailored to serve the compelling government purpose of assuring public safety.

On facts such as these, state-sanctioned penalties for alleged breaches of the peace cannot withstand constitutional scrutiny.

### V.          *Monell***: Municipal Liability**

Finally, we address municipal liability. Municipalities are not vicariously liable for the actions of their employees. However, a municipality may be found responsible for § 1983 violations, and held liable for damages pursuant to *Monell v. New York City Department of Social Services*, if the plaintiff demonstrates that the constitutional harm suffered was a result of the municipality's policy or custom. 436 U.S. 658, 694 (1978); *see also Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403 (1997).

A plaintiff may demonstrate the existence of a policy, custom, or usage in a variety of ways, two of which are relevant to this appeal. First, she may provide evidence of a formal policy officially adopted by the county. *Monell*, 436 U.S. at 690. Second, a single unconstitutional act or decision, when taken by an authorized decisionmaker, may be considered a policy and thus subject a county to liability. *Pembaur v. City of Cincinnati,* 475 U.S. 469, 480 (1986).

We conclude that Wayne County Corporation Counsel's involvement in drafting a letter to the Bible Believers, and in sanctioning the Deputy Chiefs' decision to remove the Bible Believers from the Festival, easily resolves the matter of municipal liability. "*Monell* is a case about responsibility." *Id.* at 478. Therefore, with respect to a single decision, municipal liability is appropriate "where the decisionmaker possesses final authority to establish policy with respect to the action ordered." *Id.* at 481 (footnote omitted). Corporation Counsel informed the Bible Believers by way of letter that "under state law and local ordinances, individuals can be held criminally accountable for conduct which has the tendency to incite riotous behavior or otherwise disturb the peace." Then the Deputy Chiefs consulted Corporation Counsel at the Festival to confirm that they could threaten the Bible Believers with arrest for disorderly conduct because the Bible Believers speech had attracted an unruly crowd of teenagers. As discussed at length, speech cannot be proscribed simply because it has a "tendency" to cause unrest or because people reacted violently in response to the speech. *Ashcroft*, 535 U.S. at 253 ("[T]he mere tendency of speech to encourage unlawful acts is not a sufficient reason for banning it.").

Corporation Counsel's misstatement of the law in a letter may not constitute an official policy, but her direction and authorization for the Deputy Chiefs to threaten the Bible Believers with arrest based on the prevailing circumstances is certainly an action for which she "possesse[d] final authority to establish municipal policy." *See* Wayne Cty. Muni. Code § 4.312 (Corporation counsel is the chief legal advisor to the County CEO and "all County agencies," including the Sheriff's Office). The relevant facts in this case bearing on municipal liability are substantially similar to the facts of *Pembaur*. *See* 475 U.S. at 484 ("The Deputy Sheriffs who attempted to serve the capiases at petitioner's clinic found themselves in a difficult situation. Unsure of the proper course of action to follow, they sought instructions from their supervisors. The instructions they received were to follow the orders of the County Prosecutor. The Prosecutor made a considered decision based on his understanding of the law and commanded the officers forcibly to enter petitioner's clinic. That decision directly caused the violation of Petitioner's Fourth Amendment rights."). Therefore, Wayne County is liable.

**Summary**

From a constitutional standpoint, this should be an easy case to resolve. However, it is also easy to understand Dearborn's desire to host a joyous Festival celebrating the city's Arab heritage in an atmosphere that is free of hate and negative influences. But the answer to disagreeable speech is not violent retaliation by offended listeners or ratification of the heckler's veto through threat of arrest by the police. The adults who did not join in the assault on the Bible Believers knew that violence was not the answer; the parents who pulled their children away likewise recognized that the Bible Believers could simply be ignored; and a few adolescents, instead of hurling bottles, engaged in debate regarding the validity of the Bible Believers' message. Wayne County, however, through its Deputy Chiefs and Corporation Counsel, effectuated a constitutionally impermissible heckler's veto by allowing an angry mob of riotous adolescents to dictate what religious beliefs and opinions could and could not be expressed. This, the Constitution simply does not allow.

The chief flaw affecting the dissents of Judges Rogers and Gibbons is that they acknowledge law enforcement's obligation to protect the public in general, and speakers exercising their First Amendment rights in particular, Rogers Dis. 64; Gibbons Dis. 53–55, but

seek to avoid holding the WCSO accountable to this standard by distorting the factual record to reflect an out-of-control situation in which the officers were powerless to quell the violence or reign in the mob. The "mob" in this case was comprised mostly of children and teenagers. The "violence," though not imaginary, involved little more than plastic bottle and garbage throwing. As evidenced in the video record, the WCSO's efforts to prevent this behavior were virtually non-existent. Instead, the officers largely ignored the lawless conduct of the crowd and directed what little attention they paid to the Bible Believers' situation—prior to ejecting the group—to quieting and then silencing their speech.

"Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea." *Terminiello*, 337 U.S. at 4. Excluding viewpoints and ideas from the marketplace damages us by occasioning the risk that we might subject ourselves to "tyrannies of governing majorities," *Whitney*, 274 U.S. at 376 (Brandeis, J., concurring), and thereby forestall "the advancement of truth, science, morality, and [the] arts," 1 Journals of the Continental Congress, 1774–1789, Letter to the Inhabitants of Quebec, 108 (Aug. 26, 1774). These are but a few of the reasons that the First Amendment is integral to the vitality and longevity of a free society. These are the reasons why we must accept our differences and allow our fellow citizens to express their views regardless of our distaste for what they have to say.

## CONCLUSION

Because the Wayne County Defendants impermissibly cut off the Bible Believers' protected speech, placed an undue burden on their exercise of religion, and treated them disparately from other speakers at the 2012 Arab International Festival, solely on the basis of the views that they espoused, Wayne County Defendants violated the Bible Believers' constitutional rights under the First and Fourteenth Amendments. Deputy Chief Defendants are civilly liable to the Bible Believers for having violated law that is clearly established by the Supreme Court precedent set forth in *Gregory v. City of Chicago*, 394 U.S. 111 (1969). Wayne County is civilly liable because one of its chief legal policymakers counseled and authorized the Deputy Chiefs' actions. Therefore, we **REVERSE** the grant of summary judgment by the district court in favor

of Defendants, and **REMAND** this case for entry of summary judgment in favor of Plaintiffs, for the calculation of damages, and any other appropriate relief, consistent with this opinion.

---

**CONCURRENCE**

---

BOGGS, Circuit Judge, concurring.  I concur in Judge Clay's thorough analysis of the facts and law in this case.  I write separately only to clarify a few important issues involved in this case and to respond to some of the misconceptions in other opinions.

I would have thought that a simple examination of pre-existing First Amendment law would make the following points quite clear.  *Brandenburg v. Ohio* held that obnoxious speech cannot be suppressed, even if the speaker is inciting listeners *in favor* of such speech, unless the speech is likely to incite those listeners to imminent lawless action directed at others.  395 U.S. 444, 447 (1969) (per curiam).  *Gregory v. City of Chicago* made clear that the government cannot suppress speech (in that case, allegedly provocative demonstrations by civil-rights protestors in Chicago) simply because opponents are threatening to become unruly.  394 U.S. 111, 111–13 (1969).  As Judge Clay amply demonstrates, everything that happened in this case falls exactly within the above-mentioned cases.  The Bible Believers were in a place they had a right to be—a public area—doing what they had a right to do—speaking about their religious beliefs—when they were set upon and put in some degree of physical danger by those who disagreed with their message.

Despite the colorful language in Judge Rogers's dissent, the motivations of the Bible Believers, and their status as a "majority" or "minority," are of absolutely no importance as to their legal rights or the legality of the government's actions.  "[A] function of free speech under our system of government is to invite dispute.  It may indeed best serve its high purpose *when it induces a condition of unrest*, creates dissatisfaction with conditions as they are, *or even stirs people to anger*." *Terminiello v. Chicago*, 337 U.S. 1, 4 (1949) (emphases added).  "In the realm of religious faith, and in that of political belief, sharp differences arise.  In both fields the tenets of one man may seem the rankest error to his neighbor. To persuade others to his own point of view, the pleader, as we know, at times, resorts to exaggeration, to *vilification of* men who have been, or are, prominent in church or state, and even to false statement. But the people of this nation have ordained in the light of history, that, in spite of the probability of excesses and

abuses, these liberties are, in the long view, essential to enlightened opinion and right conduct on the part of the citizens of a democracy." *Cantwell v. Connecticut*, 310 U.S. 296, 310 (1940) (emphasis added). "[I]f there is any principle of the Constitution that more imperatively calls for attachment than any other it is the principle of free thought—not free thought for those who agree with us but *freedom for the thought that we hate*." *United States v. Schwimmer*, 279 U.S. 644, 654–55 (1929) (Holmes, J., dissenting) (emphasis added).

Contrary to these precedents, Judge Rogers characterizes the speakers as the disruptors, imposing themselves upon and unsettling unsuspecting passersby. That may or may not be a fair characterization, but it is in no way different from most free-speech cases that arise in public. All of the quotations above are from cases where the speakers upset other people. The Jehovah's Witnesses in *Cantwell*, for example, played phonographs criticizing the Roman Catholic Church in a largely Catholic neighborhood, much like the Bible Believers criticized Islam at the Arab International Festival. They may do it out of love or out of hate, but it makes no difference to the First Amendment.

Judge Rogers appears to present a new theory of unprotected speech: speakers are not protected from arrest if they have some subjective intent that violence should be visited upon themselves. No hint of this appears in any previous cases, and *Gregory* certainly implicitly rejects it. Judge Rogers's arguments are reminiscent of those in his earlier opinion in *Defoe*, which established as the doctrine in our circuit alone that public-school officials have broad discretion to restrict student speech depending on the nature, not the effect, of the speech. *Defoe ex rel. Defoe v. Spiva*, 625 F.3d 324, 338 (6th Cir. 2010) (Rogers, J., concurring) (controlling opinion). In this dissent, that erroneous doctrine is extended beyond the school setting and expanded to deny the applicability of past free-speech doctrine when a speaker is maliciously seeking publicity for certain religious views.

The fact that someone can come up with a novel method of attacking a clearly established doctrine, which novel attack has not previously been specifically rejected, does not detract from the doctrine's being "clearly established." Otherwise, no doctrine could ever be clearly established, as our law schools exist in large part precisely to teach how to come up with new theories. The one situation in which I might think that an issue of material fact remained would

be if the disorder created by the attackers threatened to spill out to the general public, or to create a threat to general public safety. But the defendants here do not even make an effort to raise that as a factual argument, and an examination of the extensive video of the incident does not show a likelihood of violence to anyone other than the plaintiffs in this case.

Judge Rogers defends the police actions as mere "direction[s] to a citizen." Rogers Dissent, at 63. Yet the police clearly infringed the liberty interests of the Bible Believers. The standard definition of an arrest is when a person "is not free to go." If an officer gives a command "stay or we will arrest you," that person is not free to go and is surely arrested. Similarly, here the police order was "leave, or we will arrest you." The plaintiffs were not free to stay any more than you would be if the police came to your house and said, "come with us to our police car or we will arrest you"; you are not free to stay and are surely under arrest. *See California v. Hodari D.*, 499 U.S. 621, 626 (1991) ("An arrest requires *either* physical force . . . *or*, where that is absent, *submission* to the assertion of authority.").

But, Judge Rogers argues, if the police cannot force speakers to leave, those speakers will be able to "get the police to help [them] attack and disrupt something like a minority cultural identity fair, even if the police are not inclined to do so." Rogers Dissent, at 60. The pellucid flaw in Judge Rogers's dystopian scenario is that there is no police obligation to assist speakers in communicating their message. The law simply requires the government to refrain from silencing speakers. Requiring officers to refrain from interfering with speech can hardly be equated with affirmatively enlisting unwilling officers to "help" speakers.

Judge Rogers's opinion also has the disturbing implication that courts should decide who is a majority and who is a minority, and accord lesser rights to those whom judges deem a majority and greater rights to those whom they deem a minority. Rogers Dissent, at 60, 65. The dissent makes explicit what may be implicit in the views of some: that First Amendment rights only belong to those who "speak truth to power" and not those who "speak power to truth"; to those who "question authority" and not those who would "question those who question authority." This is wrong both as a matter of doctrine and of practice. Again, no Supreme Court case indicates that your rights depend on whether you are "punching up" or "punching down," and indeed virtually all of them hold to the contrary.

Further, in this specific circumstance it is highly dubious that the plaintiffs here, representatives of what most would consider an extreme and ill-mannered evangelical group, are imposing themselves on a minority. They were outnumbered in the immediate area, in a political jurisdiction (Dearborn) in which the "minority" is in a clear preponderance, and in a wider area (Wayne County) whose political leanings are clearly shown by the actions of the police both in this circumstance and in the previous correspondence in the record. It is both dangerous as a matter of doctrine and misleading on the facts to make anything at all in this case rest on the concepts of "majority" and "minority."

Judge Rogers concludes his dissent by observing that it is "unfortunately ironic" that the Bible Believers could invoke "cases involving minority civil rights protests." Rogers Dissent, at 65. But the real irony is that the very principle he articulates to allow the suppression of speech could just as easily be used against civil-rights protesters challenging racism or religious intolerance. The beauty of our First Amendment is that it affords the same protections to all speakers, regardless of the content of their message. If we encroach on the free-speech rights of groups that we dislike today, those same doctrines can be used in the future to suppress freedom of speech for groups that we like. I would have thought that if anything was "clearly established" in First Amendment law, it is that our view of "irony" does not trump the Constitution.

---

### CONCURRING IN PART AND DISSENTING IN PART

---

GRIFFIN, Circuit Judge, concurring in part and dissenting in part. I agree with the majority opinion that both the officers and Wayne County violated the Bible Believers' First Amendment rights. However, I would hold that Deputy Chiefs Richardson and Jaafar are entitled to qualified immunity because the right at issue was not clearly established at the time of the 2012 Arab International Festival. For this reason, I join the majority opinion except for Part IV and the final two paragraphs of Part I.C.4, from which I respectfully dissent.

The doctrine of qualified immunity "shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012) (citation omitted). A right is clearly established when, "*at the time of the challenged conduct*, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011) (emphasis added) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Put another way, "existing precedent must have placed the statutory or constitutional question beyond debate." *Id*.

As Judge Clay correctly notes, when defining the scope of the right at issue, courts must be cautious to define the right neither too narrowly nor too broadly. To that end, we must define the right at issue "not as a broad general proposition, but in a particularized sense so that the contours of the right are clear to a reasonable official." *Reichle*, 132 S. Ct. at 2094 (internal citation and quotation marks omitted). Here, the right at issue is properly defined as the right to exercise one's free speech rights in the face of a hostile crowd without the government effectuating a heckler's veto by removing the speaker for his own safety.

At the time of the 2012 Arab International Festival, "existing precedent" had not placed this constitutional question "beyond debate." *Ashcroft*, 131 S. Ct. at 2083. Although the Supreme Court's decisions in *Cantwell v. Connecticut*, 310 U.S. 296 (1940), and *Terminiello v.*

*City of Chicago*, 337 U.S. 1 (1949), had established the general proposition that police officers may not effectuate a heckler's veto, those precedents left unanswered whether the police effectuate a heckler's veto when they remove a speaker for his own safety rather than because of the content of the speech or its supposed effect on the crowd. Indeed, whether removing a speaker for his own safety amounts to a heckler's veto is the very question we resolve in this case. And, though we answer that question in the affirmative, we had not done so at the time of the 2012 Arab International Festival.

Contrary to the position of the majority opinion, precedent in fact confirms that at the time of the 2012 Arab International Festival, the right at issue was debatable. In *Glasson v. City of Louisville*, 518 F.2d 899 (6th Cir. 1975)—decided well *after Cantwell* and *Terminiello*—this court opined that when police fear a violent crowd may inflict physical injury, "they may discharge their duty of preserving the peace by intercepting his message or by removing the speaker for his own protection without having to respond in damages." *Id*. at 909. Though we now correctly reject this part of *Glasson* as dicta and overrule this principle of law, we do so for the first time. Indeed, Wayne County's pre-festival letter to the Bible Believers—which forms a basis for my conclusion that Wayne County is liable—explicitly relies on this passage from *Glasson*. The letter itself is evidence that the law in this area was not as clear as the majority opinion suggests as it relies on *Glasson* for the proposition that officers may constitutionally remove speakers for their own protection, and states that "[t]he law as announced in *Glasson* is among the laws [that Wayne County] is duty-bound to uphold."

Nor does *Glasson* otherwise clearly establish the right at issue in this case. There, this court held that the police violated the plaintiff's First Amendment rights when they destroyed the plaintiff's anti-Nixon poster that had agitated a crowd of Nixon supporters. *Glasson*, 518 F.2d at 902, 906. But, unlike this case, the crowd in *Glasson* was not actually violent towards the speaker; they were merely "hollering" and "cheered" when the officers destroyed the poster. *Id*. at 902. Thus, *Glasson* did little more than reinforce the basic principle that the police may not effectuate a heckler's veto. *Glasson*'s holding alone does not answer the question presented by this case: whether the police effectuate a heckler's veto by removing a speaker for his own safety. In fact, *Glasson* suggests that they do not.

Moreover, although numerous Supreme Court decisions opine generally regarding the constitutional infirmity of a heckler's veto, none answer the specific question posed by this case. *See, e.g., Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 880 (1997) (opining about the heckler's veto in the context of online fora); *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 468 (2009) (citing *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 574 (2005) (Souter, J., dissenting)) (restrictions on government speech amount to a heckler's veto).

In sum, § 1983 does not require that defendant officers anticipate what we decide in this case:  that police effectuate a heckler's veto when they remove a speaker from a hostile crowd for the speaker's own safety.  At the time of the 2012 Arab International Festival, reasonable minds could have differed whether the officers' treatment of the Bible Believers violated clearly established federal law.  For these reasons, I respectfully dissent from Part IV and the final two paragraphs of Part I.C.4 of the majority opinion.

---

**CONCURRING IN PART AND DISSENTING IN PART**

---

SUTTON, Circuit Judge, concurring in part and dissenting in part. I agree with the majority that the Bible Believers engaged in protected speech in a traditional public forum. I agree with the majority that the defendants curtailed the Bible Believers' speech on the basis of its content. And I agree with the majority that the defendants had other options short of removing the Bible Believers from the festival to deal with the public-safety problems generated by their speech. For these reasons, I must conclude that strict scrutiny governs the defendants' actions and that they have not satisfied it. *See Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2231 (2015). In each of these respects, I therefore join Part I of the analysis in Judge Clay's opinion. I part ways with this component of the majority opinion to the extent it draws the conclusion that a "heckler's veto" supplies a freestanding doctrinal basis for concluding that the defendants violated the Bible Believers' First Amendment rights.

That leaves (mainly) the question of qualified immunity. I agree with Judge Gibbons that the obligations of the defendants in this unusual setting were not clearly established at the time of the festival and accordingly join Parts II and III of her dissenting opinion. As Judge Gibbons's opinion shows—and as the stark differences among the many opinions in this case confirm—the First Amendment requirements in this area did not provide the kind of clarity we normally demand before imposing after-the-fact, money-damages liability on individual officers. Pity the police officer then—and perhaps even now—tasked with identifying the lines of permissible and impermissible peace-officer conduct in this non-peaceful area.

————————

## DISSENT

————————

GIBBONS, Circuit Judge, dissenting.

### I.

Although I have concurred in Judge Rogers's opinion, it is useful here, where there is strong disagreement among members of the court, to provide another alternative path to the same result.

### II.

On account of the alleged constitutional violations, the Bible Believers seek declaratory relief, injunctive relief, nominal damages, and attorneys' fees. As discussed below, however, Bible Believers are not entitled to any of these remedies. Even assuming, *arguendo*, the majority's position that a violation of the Bible Believers' constitutional rights exists, qualified immunity bars the suit against Officers Jaafar and Richardson in their individual capacities. The municipality is also not liable on the remaining damages claims because Bible Believers cannot establish that the allegedly unconstitutional action was the result of a municipal policy. Lastly, dispensing with the remaining claims, the plaintiffs' prayers for declaratory and injunctive relief are precluded by the absence of a credible threat or imminent injury.

#### A. Qualified Immunity

Bible Believers' damages claim against the officers in their individual capacities should fail under qualified immunity because there was, and still remains, no clearly established law pertaining to this specific right.

Qualified immunity affords a broad shield, ensuring "that those who serve the government do so with the decisiveness and the judgment required by the public good." *Filarsky v. Delia,* —— U.S. ——, 132 S. Ct. 1657, 1665 (2012) (internal quotation marks omitted). In doing so, it "gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the *plainly incompetent* or those who *knowingly violate the law*."

*Stanton v. Sims,* —— U.S. ——, 134 S. Ct. 3, 5 (2013) (per curiam) (emphasis added) (internal citations and quotation marks omitted).  The majority's holding effectively strips the officers of this broad protection, and instead of providing the officers with breathing room, all but suffocates them.

To determine whether a government official is entitled to qualified immunity, we must ask whether "a constitutional right would have been violated on the facts alleged" and, if so, whether the right was "clearly established."  *Saucier v. Katz,* 533 U.S. 194, 200–01 (2001).  The order of analysis is within the courts discretion.  *Pearson v. Callahan,* 555 U.S. 223, 236 (2009).  In this case, "it is plain that [the] constitutional right is not clearly established," leaving the constitutional question as an "essentially academic exercise."  *See id.* at 236–37 (permitting courts to avoid potentially "difficult constitutional questions").  My analysis therefore centers on whether the constitutional right that the defendants purportedly violated was clearly established.[1]

In determining whether a right is clearly established, it is imperative to articulate the right at issue with the appropriate specificity.  *Saucier,* 533 U.S. at 202 ("The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful *in the situation he confronted.*" (emphasis added)).  If the right is characterized at its most general level, the second prong in qualified immunity analysis would serve no purpose.  *See Ashcroft v. al-Kidd,* —— U.S. ——, 131 S. Ct. 2074, 2084 (2011) ("We have repeatedly told courts . . . not to define clearly established law at a high level of generality.  The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established."  (internal citations omitted)).

The definition, therefore, must be "particularized" in such a way that "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Anderson,* 483 U.S. at 640, 107 S. Ct. 3034 (internal citations omitted).  A case directly on point is unnecessary, but "existing precedent must have placed the constitutional question beyond debate."  *Sims,* 134 S. Ct. at 5 (quoting *Ashcroft v. al-Kidd,*

---

[1]My analysis would remain the same whether or not a genuine issue of material fact exists as to whether a constitutional violation occurred.

563 U.S. ⸺, ⸺, 131 S. Ct. 2074, 2083 (2011)).  To assist in its determination, the court should "look first to the decisions of the Supreme Court, and then to the case law of this circuit." *Gragg v. Ky. Cabinet for Workforce Dev.,* 289 F.3d 958, 964 (6th Cir. 2002).

Here, contrary to the majority's characterization, the right in question is not the general right to free speech in spite of a crowd's outrage, but the more specific right of a speaker to be free from an effective removal when his safety and the safety of others have been compromised by an unforeseen violent mob occasioning physical injury on both the speaker and innocent bystanders.  A court has yet to find that there is such a right.  Thus the determinative question is whether the officers could reasonably have believed—based on pre-existing precedent—that the First Amendment did not preclude them from effectively removing the Bible Believers.  *See Occupy Nashville v. Haslam*, 769 F.3d 434, 445 (6th Cir. 2014) ("What matters is that reasonable government officials could, like the State Officials here, understand the law very differently.")  If pre-existing precedent would lead "officers of reasonable competence [to] disagree on [the] issue, immunity should be recognized." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).  There is not one single case predating the conduct at issue that prohibits effectively removing a speaker in a materially similar context.  This alone weighs against a finding that the law was clearly established because the officers would not have had "'fair notice that [their] conduct was unlawful.'" *Lyons v. City of Xenia*, 417 F.3d 565, 579 (6th Cir. 2005) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 200 (2004)).

The majority says that the "heckler's veto" doctrine—"firmly establish[ed]" by the Supreme Court as well as this court in *Glasson v. City of Louisville*, 518 F.2d 899 (6th Cir. 1975) (Op. at 22, 36)—clearly established the Bible Believers' rights.  But the Supreme Court's decisions in this department offer little guidance about today's case.  None of the cases cited by the majority to derive the "heckler's veto" rule involved government officials acting against a speaker because of *actually occurring* violence, as opposed to signs of trouble that had *not* spilled over into violence. *See Gregory v. City of Chicago*, 394 U.S. 111, 111–12 (1969); *Cox v. Louisiana*, 379 U.S. 536, 550 (1965); *Edwards v. South Carolina*, 372 U.S. 229, 231 (1963); *Terminiello v. City of Chicago*, 337 U.S. 1, 6 (1949); *Cantwell v. Connecticut*, 310 U.S. 296, 309 (1940).  The majority sums up these decisions as "affirm[ing] the principle that 'constitutional rights may not be denied simply because of hostility to their assertion or exercise.'"  (Op. at 25

(quoting *Cox*, 379 U.S. at 551).)  The principle of course is right, *see Snyder v. Phelps*, 562 U.S. 443, 458 (2011), but it does not tell us what police should do when verbal "hostility," such as mere "muttering" and "grumbling," *see Cox*, 379 U.S. at 543, descends into violence.  Later cases say that the government may in some circumstances combat "actual" problems related to speech, especially when public safety is on the line.  *See, e.g.*, *McCullen v. Coakley*, 134 S. Ct. 2518, 2535 (2014); *Brown v. Entm't Merchants Ass'n*, 131 S. Ct. 2729, 2738 (2011); *Schenck v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357, 376 (1997).

The Supreme Court's infrequent invocation of a "heckler's veto" rationale confirms the lack of guidance that the concept provides.  The closest the Court has come to the facts of this case when using the term is in a footnote to a 1966 plurality opinion.  *See Brown v. Louisiana*, 383 U.S. 131, 133 n.1 (1966) (plurality opinion).  Even then, that use of "heckler's veto" does not help us because the Court invoked the term in the context of *potential* as opposed to *actual* violence, reasoning that it would be unfair to suppress peaceful protestors due to the danger that critics "might" react with disorder or violence.  *Id.*  On a few other occasions, the Court has used "heckler's veto" as shorthand for the undesirability of opponents being able to cut off some disfavored speech, idea, or policy, but none of those cases has any bearing here.  *See, e.g.*, *Zivotofsky ex rel. Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2115 (2015) (Roberts, C.J., dissenting); *Pleasant Grove City v. Summum*, 555 U.S. 460, 468 (2009).  In the last analysis, the Supreme Court had not clearly established that the officers acted unconstitutionally in asking the Bible Believers to leave in the face of ongoing violence, and the "heckler's veto" does nothing to fill that gap in authority.

Nor did *Glasson*—the only case that remotely mirrors the circumstances at issue—clearly establish the law that controls this case.  There, a police officer tore up the plaintiff's sign because a group across the street, apparently angered by the sign's message, began screaming at the plaintiff and, as a result, the officer feared for the plaintiff's safety.  *Glasson*, 518 F.2d at 902–03.  The Sixth Circuit held that the police officers were liable for a First Amendment violation.  *Id.* at 912.  The court found that "[t]he state may not rely on community hostility and threats of violence to justify censorship."  *Id.* at 906.  For "[t]o permit police officers . . . to punish for incitement or breach of the peace the peaceful communication of . . . messages

because other persons are provoked and seek to take violent action against the speaker would subvert the First Amendment." *Id.* at 905.

According to the majority, *Glasson* put the officers on notice that removing the Bible Believers in this circumstance could subject them to liability. (Op. at 36.) In so holding, the majority again ignores the same factual difference—*Glasson* involved no violence and the case before us involved a violent mob inflicting physical harm on the speakers. In *Glasson*, the unruliness of the crowd was limited to muttered threats unaccompanied by action; it did not involve actual, physical violence. *Id.* Here, Bible Believers (and potentially other bystanders) were showered with rocks, plastic bottles, garbage, and milk crates. (DE 1, Complaint, ¶ 46.) The Bible Believers were bruised and bloodied, with one Bible Believer bleeding from his forehead. (*Id.* at 57). The majority attempts to mitigate the pointed difference between the two scenarios by proclaiming that the violence here was "much less overwhelming." (Op. at 36.) While the majority's tolerance for pain is certainly admirable, hundreds of teenaged children throwing a deluge of objects—ranging from bottles to rocks to milk crates—can fairly be characterized as an overwhelming display of aggression and violence.

*Glasson* can be further distinguished from this case by the officers' respective responses to the crowds. The officers in *Glasson* made absolutely no attempt to calm the crowd. *Id.* at 905. In this case, although the majority faults the officers for not doing enough, neither party disputes that the officers warned, detained, and cited several debris-throwers in an attempt to rein in the chaos.

While the holding in *Glasson* may clearly establish that an officer must refrain from infringing on the right of a speaker when a crowd becomes angry and threatens violence, it does not clearly establish an officer's appropriate response to a physically violent and unruly mob of mostly children who are undeterred by police presence.

Moreover, despite *Glasson*'s ultimate conclusion, the court in *Glasson* made clear that police officers "may discharge their duty of preserving the peace by . . . removing the speaker for his own protection" when a hostile audience would unreasonably subject law enforcement to physical injury. 518 F.2d at 909. Such a pronouncement echoes a recurrent principle: the First Amendment does not afford one an *unfettered* right to exercise free speech in the face of

jeopardizing the safety of members of the public. Police officers are charged with protecting the "'lives, limbs, health, comfort, and quiet of all persons.'" *Grider v. Abramson*, 180 F.3d 739, 752 (6th Cir. 1999) (quoting *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 475 (1996)). And the Supreme Court has made plain that when a "clear and present danger" of disorder or other "immediate threat to public safety" appears, "the power of the state to prevent or punish is obvious." *Cantwell v. State of Connecticut*, 310 U.S. 296, 308 (1940). No court has ever recognized a First Amendment right that is so absolute that it can stymie police efforts to cope with highly volatile situations. Markedly, this court has emphasized that police officers *must* take the actions necessary to protect the physical safety of citizens and the overall public order. *See Grider*, 180 F.3d at 752.

The majority, seemingly disapproving the ramifications of *Glasson*, overrules it "to the extent that *Glasson*'s good-faith defense may be interpreted as altering the substantive duties of a police officer not to effectuate a heckler's veto." (Op. at 26.) The majority's decision to overrule *Glasson* ought to tell us all we need to know about the clearly established inquiry. At the time of the incident, it was not sufficiently clear to a reasonable officer that removing the Bible Believers for their own protection violated the First Amendment. Otherwise, there would be no need to overrule this part of *Glasson*. Implicit—in truth explicit—in the majority's decision is the recognition that officials could understand the law differently at the time of this incident.[2]

Even after today's decision, officials could understand the law differently. "Heckler's veto," as the many separate writings in this case suggest and as the Supreme Court's own cases confirm, is more often used as a debater's point rather than as a doctrinal tool. Even on its own terms, the "rule" does not mean that the government must invariably ignore an opponent's reaction in deciding how to treat speech. The doctrines of "incitement to imminent lawless action," *Brandenburg v. Ohio*, 395 U.S. 444, 449 (1969) (per curiam), and "fighting words,"

---

[2]Indeed, the tenets of *Glasson* and *Cantwell*, when viewed in tandem, could lead a reasonable officer to conclude that he may *not* punish a speaker for peaceful expression merely because the listeners seek to take violent action against the speaker; but, the officer *may* remove a speaker for his own protection if the audience becomes so violent as to potentially harm—or, as was the case here, actually harm—the speaker, an officer, or a bystander. When viewed through this lens, a reasonable officer, aware of the material distinctions between this case and *Glasson*, could believe that the escalating violence at the Arab Festival presented an example of when police may remove the speaker for his own protection.

*Cohen v. California*, 403 U.S. 15, 20 (1971), *allow* censorship based on listener reactions, indeed even potential reactions. The majority seems to suggest that the "heckler's veto" cases mean that, once a speaker is outside these categories of "unprotected speech" and enters the field of "protected speech," the listeners' reactions to speech may never be the basis for government regulation. Surely that is not the law—and at least the Supreme Court has never said it is. "Such a simplistic, all-or-nothing-at-all approach to First Amendment protection is at odds with common sense and with our jurisprudence as well." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 384 (1992).

Apparently recognizing as much, the majority suggests at one point that the police *may* limit speech in order to protect the speaker from a violent reaction, but *only* as a last resort. (Op. at 22 ("Punishing, removing, or by other means silencing a speaker due to crowd hostility will seldom, if ever, constitute the least restrictive means available to serve a legitimate government purpose.").) But at other points, the majority implies this is not the rule at all and that the police may *never* limit speech in order to protect the speaker, even if doing so is the *only* way to protect the speaker from serious injury or even death at the hands of an angry mob. (Op. at 28 ("Simply stated, the First Amendment does not permit a heckler's veto."); *see also* Op. at 44 ("The law simply requires the government to refrain from silencing speakers.") (Boggs, J., concurring).) Given these mixed signals, it is not even obvious what has been clearly established by today's opinion, much less clearly established what the law was when these officers were forced into action.

A situation where officers could understand the law in different ways, both at the time they acted and after this court acts, is precisely the type of occasion in which police officers should be shielded from personal damages liability. *See Malley*, 475 U.S. at 341 (finding that immunity should be recognized in those instances where officers of reasonable competence could disagree on the issue). The fact that reasonable officials can differ in their responses confirms that it was not "plainly incompetent" for the police to believe they had a right to effectively remove the Bible Believers. *Stanton*, 134 S. Ct. at 5.

## B. Municipal Liability

As *Monell* has informed us, a municipality is only liable for constitutional violations resulting from official policies or customs. The "official policy" requirement "distinguish[es] the acts of the *municipality* from the acts of *employees* of the municipality. *Pembaur*, 475 U.S. 479. An official policy commonly refers to "formal rules or understandings . . . that establish fixed plans of action to be followed under similar circumstances." *Id.* at 480. In this regard, the majority admits that Corporations Counsel misstatement of the law in the letter responding to Bible Believers does not amount to an official policy. (Op. 38–39.) Nevertheless, because a single decision by "government authorized decisionmakers" can also denote official policy, *Pembaur*, 475 U.S. at 481, the majority finds that liability attaches to the municipality through the Corporation Counsel's instruction advising the Deputy Chiefs to threaten to issue the Bible Believers a citation. (*Id.*) I must respectfully disagree.

The Bible Believers have presented no evidence from which a reasonable jury could find that Corporations Counsel, or the Deputy Chiefs for that matter, possessed final decision making authority. Unlike in *Pembaur*, where the Deputy Sheriffs were instructed *by their supervisors* to follow the orders of the County Prosecutor, 475 U.S. 469, thus imbuing the Prosecutor with final decisionmaking authority, here the evidence is devoid of any such instruction. Instead, the Deputy Chiefs merely conferred with Corporation Counsel because, after all, its duty is to "provide legal services" such as "advis[ing], consult[ing] or represent[ing]" Wayne County officers. Wayne Cnty. Muni. Code § 4.312. Some advice to an officer, though perhaps ill-conceived, does not metamorphose Corporation Counsel into a decisionmaker with final authority. Indeed, nothing in the municipal code vests Corporation Counsel with "final authority to establish policy." *Pembaur*, 475 U.S. 478; *see also id.* at 483 ("Authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possess such authority[.]"). Nor does the evidence show that Corporation Counsel was bestowed with such authority by a final decisionmaker. Advice amounts to nothing more than a recommendation, not a decision. Therefore, no genuine issues of material fact exist as to whether the violation of the Bible Believers constitutional rights stemmed from Wayne County's policies or customs.

## C. Declaratory and Injunctive Relief

Because qualified immunity only protects officials from damages liability in their individual capacities, *Flagner v. Wilkinson,* 241 F.3d 475, 483 (6th Cir. 2001), and finding no *Monell* liability only protects the county and officers from damages in their official capacity, the next step is to address whether the Bible Believers are entitled to declaratory and injunctive relief. They are not; the plaintiffs failed to sufficiently allege standing to claim injunctive and declaratory relief. *See Kusens v. Pascal Co., Inc.,* 448 F.3d 349

That the plaintiffs have standing to pursue their damages claims has no bearing on whether they have standing to request injunctive and declaratory relief. They "must demonstrate standing separately for each form of relief sought." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.,* 528 U.S. 167, 185 (2000). A prayer for both declaratory and injunctive relief requires an assessment of whether the plaintiff has demonstrated a legitimate likelihood of future harm. *See MedImmune, Inc. v. Genentech, Inc.,* 549 U.S. 118, 127 (2007) ("[T]he question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy . . . *of sufficient immediacy and reality* to warrant the issuance of a declaratory judgment." (emphasis added)); *City of Los Angeles v. Lyons,* 461 U.S. 95, 102 (1983). For the allegation of future harm to be sufficient, there must be a "substantial risk that the harm will occur," or the threatened injury must be "certainly impending." *Susan B. Anthony List v. Driehaus,* 134 S. Ct. 2334, 2341 (2014) (internal quotation marks omitted); *see Grendell v. Ohio Supreme Court,* 252 F.3d 828, 832 (6th Cir. 2001) ("'[W]hen seeking declaratory and injunctive relief, a plaintiff must show actual present harm or a significant possibility of future harm in order to demonstrate the need for pre-enforcement review.'" (quoting *Nat'l Rifle Assoc. of Am. v. Magaw,* 132 F.3d 272, 279 (6th Cir. 1997)).[3]

The Bible Believers' plans to continue to take an active role in advocating their religious beliefs at a future Arab Festival is insufficient to demonstrate that future harm is likely. Bible Believers fear that "they will again be attacked by Muslims and given the option by [the officers]

---

[3]The inquiry focuses exclusively on *prospective* conduct. *Lyons,* 461 U.S. at 103 ("[P]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief if unaccompanied by any continuing, present adverse effects." (internal quotation marks and alterations omitted)). Thus, the fact that Bible Believers were threatened with disorderly conduct at the 2012 Arab Festival is irrelevant to the determination of whether injunctive relief is apposite.

to either cease their free speech activity or face arrest for disorderly conduct." (DE 1, Complaint, ¶ 70.) The facts in record belie any contention that they will be exposed to the same or similar circumstances as present here. For the past *seventeen* years the Arab Festival has gone on virtually without incident—let alone any event remotely similar to the one at issue. This is so despite the annual presence of a multitude of Christian missionaries and evangelists from across the country. (DE 1, Compliant, ¶ 17). Even the Bible Believers concede that during this time "there was little to no conflict between the Christians and the Muslims who attended the Arab Festival." (*Id.* ¶ 24.) In fact, Bible Believers' attendance at the festival—including the day before the incident in question—was largely uneventful.

Given that the Arab-American Festival is no longer an annual event in Dearborn,[4] there are serious doubts surrounding the very existence of the Festival in the future. Thus, the prospect of a recurring problem is not only "highly conjectural" and indefinite, but also "rest[s] on a string of actions the occurrence of which is merely speculative." *Grendell*, 252 F.3d at 833. This speculative injury is not sufficient to bestow the Bible Believers with standing to pursue declaratory and injunctive relief. *Thomas v. Campbell*, 12 F. App'x 295, 297 (6th Cir. 2001) (citing *Lewis v. Casey,* 518 U.S. 343, 351–52 (1996)).

### III. Conclusion

In conclusion, I must respectfully disagree with my colleagues who believe that we should reverse. Even assuming a violation of the Bible Believers constitutional rights, they are not entitled to any relief: qualified immunity defeats plaintiffs' individual damages claims against the officers; the absence of a municipal policy responsible for the alleged constitutional violations prevents the plaintiffs from holding Wayne County liable; and finally, the lack of an imminent and credible injury precludes standing for the plaintiffs' prayers for injunctive and declaratory relief.

---

[4]*Cancelling the Arab International Festival Was an Admission of Defeat*, ARAB AMERICAN NEWS (Apr. 2, 2015, 9:51 AM), http://www.arabamericannews.com/news/news/id_10291/Canceling-the-Arab-International-Festival-was-an-admission-of-defeat.html; Niraj Warikoo, *ACLU Supports Free-Speech Rights of anti-Islam Group*,DETRIOT FREE PRESS (Dec. 26, 2014, 9:37 AM), http://www.freep.com/story/news/local/michigan/wayne/2014/12/26/aclu-supports-free-speech-rights-christian-group-hates-islam/20899957/. *See Logan v. Denny's Inc.*, 259 F.3d 558, 578 n.9 (6th Cir. 2001) (citing *Ieradi v. Mylan Labs, Inc.*, 230 F.3d 594, 598 n.2 (3d Cir. 2000) (noting that it was proper for an appellate court to take judicial notice of newspaper articles even when the articles were not before the district court)).

---

**DISSENT**

---

ROGERS, Circuit Judge, dissenting.    Today's holding provides a roadmap that effectively advises how to force the police to help disrupt a minority's speech and assembly rights.  It is as if we are advising as follows:

> Yes, you can get the police to help you attack and disrupt something like a minority cultural identity fair, even if the police are not inclined to do so.  Tell the police your plans ahead of time, and bring photographers.  Get a determined group of disrupters and go in with the most offensive and incendiary chants, slogans, insults, and symbols—the more offensive the better.  The object is to stir up some physical response.  Then, when things get rough (your goal), insist that the police protect you, and (ironically) *your* First Amendment rights, by serving as a protective guard.  The peace officers cannot at that point tell you to leave, even to avoid injury to you, because if the peace officers do that, they will have to pay you damages.  Faced with the choice of allowing you to be an injured martyr (keep your cameras ready) or serving as a protective guard as the disruption escalates, the peace officers will doubtless choose the latter and become your phalanx.  It's a win-win situation for you, and a lose-lose situation for the minority group putting on the fair.

\* \* \*

Only a formalistic application of First Amendment doctrines, from substantially different cases, could lead to a result so inconsistent with the core of the First Amendment.  This is not a case where the Bible Believers faced punishment or liability for their speech.  The only punishment threatened was a citation for refusing to move away from a physical altercation.  That fact distinguishes this case from most of the cases that the Bible Believers rely upon.

To disruptive hecklers, the irony of using a "heckler's veto" doctrine to empower them in their heckling must be sweet.  As demonstrated below, the great cases that admirably condemn a "heckler's veto" are profoundly different from this case.  They involve criminal prosecution of

speakers on the basis that the speech, itself, constituted a breach of the peace.  In *Edwards v. South Carolina*, 372 U.S. 229 (1963), for example, African-Americans gathered on the state-house grounds and some 200 to 300 curious onlookers gathered.  There was no traffic obstruction and nothing in the way of "threatening remarks, hostile gestures, or threatening language." *Id*. at 231.  Police ordered the protestors to disperse, and when they did not, the police arrested them and charged them with breaching the peace. *Id.* at 233.  The Supreme Court overturned the protestors' criminal convictions on the ground that the common-law crime of which the protestors had been convicted permitted punishment "upon evidence which showed no more than that the opinions which [the protesters] were peaceably expressing were sufficiently opposed to the views of the majority of the community to attract a crowd and necessitate police protection." *Id.* at 237.  In overturning the protestors' convictions, the Court noted (1) that "nobody among the crowd actually caused or threatened any trouble," *id.* at 231, (2) that "[p]olice protection at the scene was at all times sufficient to meet any foreseeable possibility of disorder," *id.* at 232–33, (3) that "[t]here was no violence or threat of violence on [the protesters'] part, or on the part of any member of the crowd watching them," *id.* at 236, and (4) that "[p]olice protection was 'ample,'" *id.*  These facts, the Court explained,

> [were] a far cry from the situation in *Feiner v. New York*, where two policemen were faced with a crowd which was "pushing, shoving and milling around," where at least one member of the crowd "threatened violence if the police did not act," where "the crowd was pressing closer around petitioner and the officer," and where "the speaker passes the bounds of argument or persuasion and undertakes incitement to riot."

*Id.* at 236 (quoting *Feiner v. New York*, 340 U.S 315, 317–18, 321 (1949)).  Nothing in *Edwards* is even close to the situation in this case.  In *Edwards* there was no hint of an altercation or disruption.

The same distinction applies to *Cox v. Louisiana*, 379 U.S. 536 (1965), a landmark of the Civil Rights Movement of the 1960s.  There, police arrested the speaker the day after a peaceful student protest in which the speaker advocated that his fellow protesters conduct sit-ins at certain local businesses. *Id.* at 542–44.  The Supreme Court overturned the conviction for breaching the peace because the speaker had been punished "merely for peacefully expressing unpopular views." *Id.* at 551.  That, the Court once more clarified, was different from punishing a speaker

for deliberately thwarting law enforcement's legitimate efforts to pacify an altercation. *Id.* at 550–51 (distinguishing *Feiner*). The evidence alleged to indicate potential violence was limited to purported grumbling, muttering, and jeering from a group of 100 to 300 white people across the street. *Id.* In short, the Court held that the speaker could not be convicted of using words that disturbed the peace merely because his words might have led to an altercation. This is categorically different from holding that the police may not separate people who are involved in an altercation, and threaten a citation if one of the parties fails to separate.

*Terminiello v. City of Chicago*, 337 U.S. 1 (1949), also involved the Court's overturning the conviction of a speaker for breaching the peace, where the ordinance on which the conviction rested "permitted conviction of [the speaker] if his speech stirred people to anger, invited public dispute, or brought about a condition of unrest." *Id.* at 5. The decision addressed only whether the speaker could be convicted of a crime based on his speech's tendency to cause unrest. The decision said nothing about what steps police could take to quell an altercation already underway—which is to say, it said nothing about the actions of the police in this case.

*Cantwell v. Connecticut*, 310 U.S. 296 (1940), involved a Jehovah's Witness and his two sons who had gone door-to-door in a Catholic neighborhood distributing literature and requesting pedestrians' permission to play a phonograph record critical of the Roman Catholic Church, which offended the pedestrians. The Supreme Court overturned the convictions of the Jehovah's Witnesses for breach of the peace, reasoning that the laws at issue criminalized the family members' peaceful exercise of their First Amendment liberties. *Id.* at 310–11. The Court found that there was "no assault or threatening of bodily harm, no truculent bearing, no intentional discourtesy, no personal abuse." *Id.* at 310. The case did not deal with incitement to violence or breach of the peace, much less an actual altercation.

Finally, the difference between these cases and the instant case is clearest in *Gregory v. City of Chicago*, 394 U.S. 111 (1969). There, police ordered a group of peaceful protestors to disperse after onlookers became unruly. "When [the officers'] command was not obeyed, [the protestors] were arrested for disorderly conduct." *Id.* at 112. The Supreme Court overturned the ensuing criminal convictions. *Id.* at 112–13. As the Court made explicit, however, its ruling in that case was based on its understanding that "[the protestors] were charged and convicted for

holding a demonstration, not for a refusal to obey a police officer." *Id.* In a footnote the Court added that "[n]either the ordinance nor the charge defined disorderly conduct as the refusal to obey a police order." *Id.* at n.*. *Gregory* is thus inapposite, because the Bible Believers were threatened with a citation, not because of anything they said, but because they asked what would happen if they disobeyed a police officer. Indeed, the video evidence in this case—supplied only by the Bible Believers—shows the reluctance of the police even to threaten citation. The police chief confirmed that the Bible Believers would be cited only after the Bible Believers repeatedly demanded to know "what he would do" if they declined to depart.[1]

In sum, the Supreme Court has consistently distinguished between prosecuting a person for exercising his First Amendment rights—which is unconstitutional—and insisting that a person comply with a police officer's order to leave the scene of an ongoing physical altercation so as to prevent further injury—which is constitutional. It cannot be that every police officer's direction to a citizen to do something requires strict scrutiny just because speech is also involved. Strict scrutiny does not apply, for example, to pulling over a truck for a traffic violation just because there was a message on the side of the truck. Nor could strict scrutiny reasonably be applied to telling two brawling teenagers to separate before they get hurt, even if the brawl started with a verbal argument about some issue. Police officers should not be made to pay damages in such circumstances. This case is no different.

---

[1]Here is an excerpt of the conversation between the police chief and one Bible Believer ("BB"):

BB: Let me ask you this: If we don't leave, are we gonna get arrested?
CHIEF: Probably.
BB: I just need to know, yes or no.
CHIEF: Probably.
BB: That's like me probably saying, "Yes, probably we'll stay around."
CHIEF: Probably we will cite you all, yes. I mean, if that's what you want then, I mean, I don't, I don't understand what good that does.
BB: I just need to know if I'm gonna be arrested or not or if you just thought it was a good idea that we walk away. If you're telling me that we're gonna get arrested, that's what I need to know. Are you telling me that we're gonna get arrested if we . . .
CHIEF: I'm not telling you that you're going to get arrested, but, you know, you're a danger to the public safety. You're disorderly.
BB: I would assume, you know, two hundred angry Muslim children throwing bottles would be more of a threat than a few guys with signs.
[Brief interlude]
CHIEF: Alright, you need to leave.
BB: Again, I just want to make an ask, so, if we don't leave, you're saying . . .
CHIEF: If you don't leave, we're gonna cite you for disorderly.

Strict scrutiny applies to rules about speech that allegedly could cause a brawl, not to efforts to control a brawl. The Bible Believers spoke loudly and freely throughout the festival for over an hour. Indeed, for some of that time, the presence of police officers actually made it possible for the Bible Believers to speak without being accosted by the crowd. The officers' instruction to leave, moreover, only occurred once there was an altercation that left one of the Bible Believers bleeding from his head. This is not a case about "the mere possibility of violence." *Ante* at 34. The video evidence shows plastic bottles, rocks, and other hard objects such as a milk crate being thrown at the Bible Believers, and not just by children. Indeed, as the majority describes the video, it shows that "a barrage of bottles, eggs, and other debris [was] hurled upon the Bible Believers" and "[a]t some point during the deluge, Israel was struck in the face." *Ante* at 12–13. Violence had broken out when the police stepped in. The only question confronting police at that time was how to handle it.

It cannot be that, in an altercation where one side is greatly outnumbered but wants to risk injury by standing its ground, police officers are obligated to permit the risk—indeed, must put themselves at risk—in the name of the First Amendment. The First Amendment does not compel police to stand by and ignore their duty to protect the public.

Cases like the one before us properly call for a balancing of the speakers' First Amendment interests and the community's need for safety and order. Of course, police should not be allowed to treat every outbreak of violence as cover for suppressing speech, and where it is reasonably possible to vindicate a speaker's First Amendment rights, police should do so. But it will not always be possible to do so, taking into account all of the factors peace officers must consider, such as the nature of the crowd, the resources available to police at the time, and other factors bearing on law enforcement's ability to control the scene around a speaker. Drawing a rigid line based on abstract doctrinal principles robs police officers of the discretion and judgment that is essential to law enforcement. If the police may stop the altercation, they may do it in a reasonable way, under the circumstances as actually presented. If bringing in a larger police force is not a then-available option in the reasoned view of the peace officer on the scene, separating the parties is reasonable. In the context of this case, separating the parties meant escorting away the less numerous group. This was a practical and reasonable thing to do—not prohibited by the First Amendment unless the First Amendment rigidly requires peace officers to

determine which side threw the first stones or punches, and thereafter to protect the other side as the brawl continues.

When festivalgoers began attacking the Bible Believers, law enforcement officers at the Arab Festival had a choice: attempt to restrain the large and physically abusive crowd, or ask the Bible Believers to leave. The record shows that the officers made efforts to restrain the festivalgoers. Among other things, they ventured into the crowd to identify the individuals who were throwing debris and rocks at the Bible Believers, and issued some warnings and citations. This is not a situation, then, where law enforcement jumped at the first opportunity to evict an obnoxious group. To the contrary, it appears the officers tried to avoid having to evict the Bible Believers.

Despite their efforts, however, the officers ultimately determined that they could not easily stop the altercation while the Bible Believers were present. The officers thus decided to remove the Bible Believers from the festival grounds. The First Amendment does not prohibit that reasonable exercise of judgment, and this conclusion is consistent with *Glasson v. City of Louisville*, 518 F.2d 899 (6th Cir. 1975). In *Glasson*, police violated the First Amendment by tearing up a protester's sign after hecklers began grumbling and muttering threats about it from across the street. *Id.* at 901–02. There was no actual violence in *Glasson* or even a move toward actual violence. *Glasson* involved police conduct to preempt potential violence. In contrast, there was nothing potential about the fracas at the Arab Festival.

* * *

It is unfortunately ironic for the Bible Believers to succeed in their tactics in this case based on towering but distinguishable cases involving minority civil rights protests. In the greater Detroit community, it is the minority's cultural expression that loses from today's decision. The disrupters here came from a different part of a larger community to disrupt the First Amendment activity of Arab-Americans—a sometimes feared, misunderstood, or despised minority within that larger community. Realistically viewed, the Bible Believers were hecklers seeking to disrupt the cultural fair. The police visibly attempted to reconcile the First Amendment rights of festivalgoers and the Bible Believers. There may have been much better ways for the police to handle this situation, but there was no First Amendment violation.